1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3   LIVE FACE ON WEB, LLC,        )
    a Pennsylvania Company,       )
4                                 )
5        Plaintiff,               )
                                  )
         vs.                      )   Docket No. SA-15-CV-539-OLG
6                                 )
    DANIEL MORENO, Individually ) San Antonio, Texas
7   and d/b/a FULL SERVICE        )   January 10, 2017
    VENDING CO.,                  )   3:02 p.m. to 4:13 p.m.
8                                 )
         Defendant,               )
9                                 )
         vs.                      )
10                                )
    VENDCENTRAL, a California     )
11  Company,                      )
                                  )
12       Third Party Defendant. )
    _____)
13              TRANSCRIPT OF MOTION HEARING
14        BEFORE THE HONORABLE HENRY J. BEMPORAD
              UNITED STATES MAGISTRATE JUDGE
15
    TRANSCRIPT ORDERED BY:  Shawn Michael Grady, Esquire
16
    A P P E A R A N C E S:
17
    FOR THE PLAINTIFF:
18       STANDLY & HAMILTON, LLP
         By:  Jodie Slater Hastings, Esquire
19       325 North St. Pearl Street, Suite 3300
         Dallas, TX  75201
20
         LOPEZ SCOTT, LLC
21       By:  Orlando R. Lopez, Esquire
         3707 N. St. Mary's Street, Suite 200
22       San Antonio, TX  78212

23  FOR THE DEFENDANT:
         SHEEHY WARE & PAPPAS, PC
24       By:  Shawn Michael Grady, Esquire
         909 Fannin Street, Suite 2500
25       Houston, TX  77010

```
 1   COURT RECORDER:  FTR Gold

 2   TRANSCRIBER:
           CHRIS POAGE
 3         United States Court Reporter
           655 East Cesar E. Chavez Blvd., Rm. 314
 4         San Antonio, TX  78206
           Telephone:  (210) 244-5036
 5         chris_poage@txwd.uscourts.gov

 6   Proceedings reported by electronic sound recording, transcript
     produced by computer-aided transcription.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Open court)

2              **COURT SECURITY OFFICER:**  All rise.

3              **THE COURT:**  Good afternoon.  Please be seated.

4              Calling the case of SA-15-CA-539, Live Face on Web,

5    LLC, versus Daniel Moreno, et al.  If I could have announcement

6    of counsel, please.

7              **MR. GRADY:**  Your Honor, Shawn Grady representing

8    defendant Daniel Moreno.

9              **THE COURT:**  Okay.

10             **MS. HASTINGS:**  Good afternoon, Your Honor.  My name

11   is Jodie Hastings.  I'm here on behalf of the plaintiff, Live

12   Face on Web.

13             **THE COURT:**  All right.

14             **MR. LOPEZ:**  Orlando Lopez, Your Honor, on behalf of

15   the plaintiff as well.

16             **THE COURT:**  All right.  I gather then we don't have

17   anyone here on behalf of the third-party defendant, though

18   they're not really at issue in this particular -- the motions

19   that are set today.

20             All right.  Very well.  You may be seated.

21             We have two motions set for a hearing today.  That's

22   the first motion for -- to compel responses to request for

23   production that was filed sometime ago -- that's docket entry

24   54, I believe -- and then more recently, docket entry 60, the

25   second motion to compel.

 1          There's also out there the question of -- those were

 2  filed by the defendant.  There's also out there the question of

 3  the plaintiff's motion for summary judgment.  The reason why

 4  that has some relevance here is because the response of the

 5  defendant has been to request to defer responding to that

 6  motion further until there's additional discovery.  So to the

 7  extent that discovery is at issue there, too, I'd like to hear

 8  about that, if I can.

 9          So let me hear from the defense as to these two

10  motions.

11          **MR. GRADY:**  Thank you, Your Honor.

12          **THE COURT:**  You may -- if you could approach the

13  podium.

14          **MR. GRADY:**  Oh, yes.

15          **THE COURT:**  We do recording here.  There's no court

16  reporter.

17          **MR. GRADY:**  Okay.

18          **THE COURT:**  And this makes a better recording there.

19  The little microphones on the table are not great.

20          **MR. GRADY:**  No problem.

21          A little background, if you may, Your Honor.

22  Initially -- okay.  So my client is Daniel Moreno, a small

23  businessman, in April 2012 he decided to create a website.  He

24  hired a company to do it, Vend Central, the third-party

25  defendant.

1       And he bought a video web spokesperson from another

2  company named TweakWell, who is now -- who has been liquidated

3  in bankruptcy.  And then about 40 -- and he put it on his

4  website.  He had Vend Central do it.  He has no technical

5  background.  He's in the vending machine business.  And then

6  low and behold about four years later he gets sued by Live

7  Face.  No cease and desist, no -- you know, no warning, just

8  we've -- you know, he's just been sued.

9       He is one of hundreds of individuals and businesses

10  in states across the country who have been sued by Live Face,

11  which, you know, a PACER search will reveal, and we have

12  submitted that to the Court.  It's on the record.  And it's

13  basically for the same product, which is an issue that

14  defendants contend with, because they say they have multiple

15  versions, they do different things.  So that's going to be an

16  issue.

17       Initially, I was not on the case.  I appeared later.

18  And my initial analysis and my recommendation was that, okay,

19  this product does not appear to be worth a lot.  They made

20  damage demands that were very high.  And I thought, well, this

21  product -- I did do some research on the web, looked at both

22  products and found that the product could be had for very low

23  amounts.  I understood the damage -- under the copyright act,

24  the actual damages to be fair market value.

25       So initially my approach was just to mine the damage

aspect of the case.  And I'd seen the litigation history, so I thought, okay, maybe there's something to this.  Maybe, you know, TweakWell copied it.  And they -- clearly, they think so.  They sued a hundred times on it, you know.

And I have no software expertise, so I didn't -- you know, I contacted some experts, and they were very costly.  I mean, in the IP world experts are -- they're -- it's just outrageous.  So I was like, okay, this seems like a good strategy.  Maybe we can come to -- you know, just get the damages down, get a reasonable settlement, you know, that's good for my client.

So we issued the first RFP.  So that's why the RFP and the damages are kind of -- the first RFP are primarily damage related, you know.  And then we sought mediation.  And I gave extensions to plaintiff's counsel.  We set up a date, and I made it clear to everybody, I was like, we need to get responses so we can evaluate the damages so we can, you know, mediate after mediation.

And we didn't get a response.  And at that point I realized, okay, we're going to have to look at the merits of the claim.  And then they filed the MSJ.  So, of course, we were forced then to look at that.  So then I consulted with experts.  Copyright attorney Joel Rothman, he's been -- he's appeared, and he is -- he has been -- he's going to take all the depositions of experts in the case, highly qualified.  And

he had -- he connected me with some experts, too, a software

coding expert and a damages expert who's also a software coder

who's been in the business for a long time.  And both of those

reports are on the record.  They're attached to defendant's

reply to plaintiff's response to the second motion to compel.

          And so once I consulted with Rothman and his experts,

then I realized that Mr. Moreno has a very strong defense.  I

did -- and part of the plaintiff's tactic, I believe, and I

suspect, is that they hide behind some of the esoteric nature

of software code and the difficulty and the high expense of IP

litigation.  But anyways, that's -- you know, that's a tangent.

          So we requested our second RFP.  That was in

November.  The first RFP was in August.  Plaintiff did not

respond to the second RFP.  I mean, they did respond, but they

didn't produce any documents.  Then we started scheduling

depositions.  Those are -- those are imminent, the first of

which being plaintiff's expert, Dr. Goldberg, in about a week,

and then the corporate rep on the 25th, and then our experts

are -- we're negotiating, trying to work out dates.  But we're

going to present them.

          And the discovery deadline, of course, is in

February.  So we have to take these depositions, and we haven't

received full responses to our discovery requests, and we've

conferred, and there's been no good reason that we can see.

And, you know, so that's why we filed the motions.

1    **THE COURT:** Let me just -- let me just ask you.  We

2    can go through the various requests, the first set and the

3    second set in either order.  But to what extent are those

4    documents that are requested in the first or second request

5    necessary to conduct the deposition of the expert or the

6    deposition of the corporate representative?

7            **MR. GRADY:** Well --

8            **THE COURT:** Because, I mean, just looking at it, I

9    didn't see -- I wasn't exactly -- I mean, some of this -- how

10   do you -- documents that would support your claim --

11           **MR. GRADY:** Well --

12           **THE COURT:** -- type of things.  And maybe you need

13   those things and so forth.  Go ahead.

14           **MR. GRADY:** -- for the corporate rep, I mean, we

15   would like to know records of the company, accounting records

16   on customers who actually paid the monthly licensing fee.  The

17   plaintiff produced contracts which reflect -- and I should -- I

18   should also bring up, on January 4th, which it's not on the

19   record, plaintiff designated rebuttal expert, Dr. -- not

20   doctor -- Walter Bratic.

21           **THE COURT:** Oh, okay.

22           **MR. GRADY:** And he produced a report.  They served us

23   with a report.  It has not been filed.  And there are two

24   paragraphs in this report and opinions of Dr. Bratic which I

25   think show the relevance of -- the necessity for discovery for

the corporate rep at least.

He says in his opinion in paragraph 7 -- I have a copy here -- that Mr. Norris, who is Wayne Norris, who is defendant's damages expert, that his opinion is totally unreliable because he lacks relevant data points in determining the market value of the LFOW code. Those data points consist of critical information which includes the amount that customers actually paid for the rights to the LFOW code, not just the amount that they have agreed to.

And these are specific requests in my first RFP that we have not received a response to. We did receive the contacts.

**THE COURT:** I guess the reason I'm asking this is when you talk about deposing the expert or the documents, again, those -- that sort of question, what was paid by other customers, is a damages issue as far as I can tell. There's different ways to show damages in a copyright infringement case, and, of course, there's also statutory damages as an alternative.

But I'm still wondering -- you know, like I said, you know, this kind of bleeds over into the issue of the motion for summary judgment. And I'm wondering what documents do we need to go forward on that motion, to get that resolved? And so I'm trying to figure -- that's what I'm trying to figure out.

**MR. GRADY:** Okay. And here's another one. And it's

an issue that's confusing to me as to the differences between
the different video spokesperson products, the 7.0 or 6.0. And
I don't know what the difference is.

Apparently, according to responses from the
plaintiff, the version that is sold on the website is not even,
you know, licensed software. But recently -- although -- I say
I don't know. I didn't know until Bratic -- I still don't
really know, but I know now at least somewhat from the
plaintiff that -- from Mr. Bratic, that he -- in an interview
with the CEO, Mr. Shcherbakov, that the differences are solely
based on certain terms that they offer their customers, nothing
to do with code, which is new. They haven't pled that. They
haven't -- we don't have any documents which describe to
defendant what are the differences between the products.

And that is a pending -- you know, and we have many
discovery requests on the first and second RFP which seek to
discover the nature of the product and what -- and, very
importantly, what is the difference between the product that
costs $300 and 3,000 versus the one that's monthly licensed for
6,900?

And Bratic describes it here in paragraph 42. It's
important. This is the only document that we have of that. I
would suspect that there are other documents that the company
has that would describe and put defendant on notice as to what
the difference of those products are so that when we have the

1  deposition on the 25th, we can be informed and ask, you know,

2  the corporate rep about differences in those products and how

3  they price them.  As of now, I have nothing but Bratic's

4  report, which is based solely on an interview -- it's even

5  footnoted, "Interview of Eduard Shcherbakov," period.  That's

6  it.

7       **THE COURT:**  Well, I guess I'm still wondering how

8  would that -- depending on which product it is, how does that

9  affect the question of liability in the motion for summary

10  judgment?  Are you saying that it's an earlier version or a

11  later version; that this somehow affects either the validity of

12  the copyright owned by Live Face on Web or the nature of the

13  infringement by your client, or what are we talking about?

14       I still -- all that still sounds to me like a

15  question of how much it costs.  How much it costs is a damages

16  issue.  I'm trying to get at -- and the reason I'm asking is I

17  will need to know when you're going to respond fully to this

18  motion for summary judgment.  I need to know if there's going

19  to be additional motions for summary judgment as to damages.

20  I'm trying to get a handle on this litigation.  I'm a little

21  concerned we don't have the third party here since it sounds

22  like you didn't -- Mr. Moreno doesn't know anything about how

23  he got this information.

24       But I'm trying to figure out, to the extent we're

25  litigating the issue of liability, how are we litigating that

1  and to what extent is this discovery necessary for that?

2       **MR. GRADY:**  Absolutely.  And I haven't talked about

3  that, and I will talk about it.

4       **THE COURT:**  Okay.

5       **MR. GRADY:**  Okay.  And so Nancy Moreno [sic] is a

6  software coder.  She produced a report which in detail will

7  describe -- I'll summarize it.

8       **THE COURT:**  Nancy Miracle.  I think it's

9  Nancy Miracle.

10       **MR. GRADY:**  Nancy Miracle.  I'm sorry.  I apologize.

11       **THE COURT:**  Go ahead.

12       **MR. GRADY:**  She produced a report.  We attached it.

13  It's in the reply to the response to the second motion to

14  compel.  And I'll summarize it here.

15       **THE COURT:**  There's -- let me just stop you there.

16  There's a reply to the response to the second motion to compel?

17  The only thing I received was a response yesterday.  I filed --

18       **MR. GRADY:**  Oh, I'm sorry, Your Honor.  It might be

19  on -- I'm sorry.  It might be to the first -- let me see --

20       **THE COURT:**  I have the first motion to compel, a

21  response and a reply.  There was some litigation over when to

22  respond to the second motion to compel, which I resolved by

23  saying, do it by yesterday, put the second motion to compel on

24  this hearing as well.  So since we're here, let's get it

25  resolved.  I haven't seen any reply to that response.  If so,

it would have been filed today. And I'll --

        **MR. GRADY:** Yeah.

        **THE COURT:** -- to be frank, I had hearings all day today. So I haven't seen any reply to the response.

        **MR. GRADY:** No. That's correct. I did not. I --

        **THE COURT:** Okay. Very well.

        **MR. GRADY:** Yeah. I filed the expert report of Nancy Miracle and Wayne Norris. And it's attached to the second motion to compel.

        **THE COURT:** Oh, to the motion itself? All right. Very well.

        **MR. GRADY:** Yeah. I'm sorry. I'm getting -- there's so many -- yeah, there's two motions to compel. It's getting confusing.

        **THE COURT:** I understand. All right. Go ahead.

        **MR. GRADY:** It's Nancy Miracle's -- and I have a copy here, too.

        **THE COURT:** I have that whole motion and all the attachments. So go ahead. All right.

        **MR. GRADY:** Okay. So just to summarize her opinions real simply, which is basically the only way I know how, the first defense is that LFOW's video spokesperson version 7.0 is not copyrighted. She did an analysis of the code. Let me get my notes here.

        And the first part of her analysis looks at the

sources.  It doesn't compare it to Moreno's, but it looks at
the sources of the code itself.  And she provides detail of her
claims, too.  So she breaks it down.  And basically 94 percent
of the code is not original.  38 percent of the code was
previously published by other coders.  It actually includes
other copyrighted code, which Live Face failed to -- or
omitted -- I don't know if intentionally or unintentionally --
to the copyright office, as far as we know, at least -- and
that's an affirmative defense we have in this case.

18 percent of the code is written to comply with the
design of Shockwave Flash, which is the actual video player
which is not an optional type of coding.  And then 30 percent
of the code is dictated by efficiency and the fundamental
operation of the code.

Now, in this analysis it also includes the legal
standard, the Abstraction-Filtration Test which gives, you
know, recognition of her analysis as a valid way to determine
whether -- you know, software code is written --

**THE COURT:**  All right.  Let me just stop you there.
If she's been able to do -- make this assessment based on the
data that she's received, why do you need more discovery on
that data if you already have an expert who's been able to
make -- obviously they're going to disagree, but --

**MR. GRADY:**  Right.

**THE COURT:**  -- you've got your expert.  Does your

1   expert say, "Hey, I'm missing some stuff?"

2         **MR. GRADY:**  Well --

3         **THE COURT:**  That's -- I mean, you see why I'm asking.

4   I'm trying to get you --

5         **MR. GRADY:**  Right.  Yeah.  No.  I know.

6         **THE COURT:**  -- the information you need so you can

7   move forward.  They'll probably ask the same thing of this --

8   when they depose this --

9         **MR. GRADY:**  Yeah.

10         **THE COURT:**  -- this expert.  They're going to ask

11   some of those questions, too.  So that's my question.

12         **MR. GRADY:**  Okay.

13         **THE COURT:**  Is there -- in this -- it's a very

14   lengthy report.  I think it's somewhere around 70, maybe

15   more -- 70 pages.

16         **MR. GRADY:**  Yeah.

17         **THE COURT:**  -- additional of that.  Is there -- is

18   there somewhere in this massive report or request, "Look,

19   there's some documents that are being hidden from me so I can't

20   see" --

21         **MR. GRADY:**  Well, I guess --

22         **THE COURT:**  -- or, "I need" -- if not hidden, "I

23   haven't been able to obtain them yet," or anything like that.

24         **MR. GRADY:**  Well, yeah.  They would be -- there's

25   requests for, I mean, you know, stuff -- communication with the

copyright office.  As far as what are the -- you know, 38

percent of the code was pre-published by other coders, I mean,

we're going to have the corporate rep there, you know.  I'd

like to know, do we have all the communications with the

copyright office, you know, anything that went into your

copyright, basically.

        **THE COURT:**  Okay.

        **MR. GRADY:**  What all went into it?  Did you know --

did you -- you know, the only way that we get any evidence on

knowledge would be through the corporate rep.  And if we had

documents, that would greatly, you know, assist in our line of

questioning on that topic.

        **THE COURT:**  And I think that's within -- my memory is

that's within the scope of the motion to -- the request for

production.  There was some request regarding the information

provided to the copyright office in support of their --

        **MR. GRADY:**  There was.  There was.

        **THE COURT:**  All right.

        **MR. GRADY:**  But we have no way of knowing whether

that's all there is because --

        **THE COURT:**  They said they've produced some stuff,

but you --

        **MR. GRADY:**  They have produced some stuff.

        **THE COURT:**  -- don't know if it's -- all right.

Well, we'll find out.

1          Other question I had for you is this issue of which

2     version.  Is it clear in your mind from the complaint which

3     version is claimed to be infringed here?  Is it 6.0?  Is it

4     7.0?  Is it an earlier one?

5          **MR. GRADY:**  It's definitely --

6          **THE COURT:**  Is that why -- is that why -- is that an

7     issue here?  I didn't think that was.

8          **MR. GRADY:**  Well, it's definitely 7 -- they allege

9     7.0 is infringing -- I think that it's undisputed that -- you

10    know, that they allege that 7.0 --

11         **THE COURT:**  All right.  So why would you need any

12    information regarding any other product?  If that's the only

13    thing they're alleging being infringed, they're not going to

14    come in -- and they're going to say, "Oh, look, here's 6.0, and

15    they infringed that, too."  That would be irrelevant.

16         **MR. GRADY:**  Well, I mean, some of our requests just

17    seek, you know, because -- I guess it goes to damages.

18         **THE COURT:**  Oh, all right.  Go ahead.

19         **MR. GRADY:**  Yeah.  That's the predominant --

20         **THE COURT:**  The idea being that what they charged for

21    the other one would have some relevance to what they're

22    charging for this one?

23         **MR. GRADY:**  Yeah.  I just have no idea how they get

24    to the 6,900.  Does it include, you know, services?  Is

25    there -- what are you telling the customers, too, most

importantly, because it's fair market value.  So if you have a

willing buyer, you know, what are they agreeing to?  I don't --

I don't understand.  I just don't understand what they're

disclosing to them, you know, separate from these -- a couple

of contracts they produced.

       But, yeah, on the coding, I guess -- on the actual

infringement, I'm trying to think what other requests.  And our

second RFP predominantly seeks, you know -- seeks documents on

liability and --

       **THE COURT:**  But, yeah, that's what I'm trying to

get --

       **MR. GRADY:**  Yeah.  Right.

       **THE COURT:**  What I'm trying to get at, sir, is I need

to know what you're going to need to -- I'm trying to pin you

down.  I need to know what you need to have so that you can,

armed with Ms. Miracle's expert report, respond to the motion

for summary judgment, move forward on the liability issues

and -- you know, separate and apart from the damages issues we

also have to address.  I'm just trying to go through them in

some logical way.

       **MR. GRADY:**  Okay.  I understand.

       **THE COURT:**  So what -- is there something -- the

communication to the copyright office, I'll hear from the other

side on that.  Is there other stuff that you're looking for

perhaps with regard to other litigations that are -- have

1   any -- happening around the country?  I know that they're --

2          **MR. GRADY:**  Oh, yes.

3          **THE COURT:**  -- you've made the allegation that

4   there's 123 cases.  There are -- appear to be a large number of

5   cases with Live Face as a plaintiff.  I know that there was

6   multidistrict litigation that was attempted last year, in

7   December of 2015, involving 32 cases, 12 of which settled, 20

8   which were still pending at the time that multidistrict

9   litigation centralization was requested and denied.  And so

10  there's those cases.  Perhaps those cases are more directly

11  relevant involving, for example, 7.0 or similar charges to --

12  the charges against Mr. Moreno since he's listed as one of

13  those cases.

14          Is that what -- I'm just trying to get at what you

15  need so I can ask the other side, what have they produced.

16          **MR. GRADY:**  Yes, you are right.  The deposition

17  transcripts in these other similar actions --

18          **THE COURT:**  Do you know -- to your knowledge are

19  there deposition transcripts in these other civil actions?

20          **MR. GRADY:**  Well, they didn't fully respond to the

21  request, so I don't know.  Honestly, I don't.  I mean, I think

22  that there is at least -- I have found information [inaudible]

23  one other one, I've heard.  I don't have reliable information

24  on that, but I do -- people just talking, other lawyers, I've

25  heard that there is another one.  So one other one at least.

1           **THE COURT:**  All right.  Let me ask you, with regard

2     to Mr. Goldberg, their expert, have you had other defense

3     counsel reach out to you and say, hey, we'd like to attend that

4     deposition or be involved in that deposition because the

5     multidistrict litigation panel indicated one of the reasons

6     they weren't consolidating this case is because there was the

7     possibility, and I'll quote, of alternatives to centralization

8     such as shared experts and common depositions.  So --

9           **MR. GRADY:**  Right.

10          **THE COURT:**  -- I mean, I'm trying -- I'm interested

11    to see how many times we're going to be going down this road.

12    Have you had any contact with any of these other --

13          **MR. GRADY:**  Well, Mr. Rothman actually spearheaded

14    the MDL, and he came to us.

15          **THE COURT:**  All right.

16          **MR. GRADY:**  So the answer --

17          **THE COURT:**  So to the extent -- so he at least is

18    aware of some of these other defendants and may be in contact

19    with their particular lawyers?

20          **MR. GRADY:**  Absolutely.  In fact, Ms. Miracle was an

21    expert in Mr. Rothman's case --

22          **THE COURT:**  Oh, all right.

23          **MR. GRADY:**  -- when he defended a case against Live

24    Face.  And according to Mr. Rothman, there's been -- you know,

25    this is kind of new, that we're -- that I'm involved in and

developing this defense. Because other plaintiffs, they just
settle so quickly. It's just because of the cost and expense
of the experts. So this issue of the defense and the copyright
ability of Live Face's video spokesperson, whether version 1 or
7, which to me, as I understand it, is not a big -- it's not --
the code is the same, right. So it has not been put to the
test. It has not been put, you know, where somebody is -- has
gotten experts and, you know, taken it all the way. But that's
what we're doing.

And, you know -- and so -- but, you know, I don't
know specifically any more documents other than, I think the
settlement agreements -- well, they're not --

**THE COURT:** Yeah. I don't see how they would be --

**MR. GRADY:** Yeah, they're not.

**THE COURT:** Typically, they're not admissible on that
basis under the rules of evidence.

**MR. GRADY:** Yeah.

**THE COURT:** They may be helpful maybe if you wanted
to settle the case. You could see what other people were
settling for. But I don't see how it'd be relevant to the
motion for summary judgment that's been filed by plaintiff.

**MR. GRADY:** Yeah.

**THE COURT:** But if you're thinking that the
communications with the copyright office -- you need to know if
anything's been withheld with regard to that, and then the

1  issue as to other depositions or discovery produced on

2  extremely similar cases --

3        **MR. GRADY:**  Right.  Yes.  And the depositions of the

4  damages is very important to the issue, and it will come up in

5  pretty much all of them.  And it would be -- you know, it would

6  be very helpful if we had documents to, you know -- to review

7  beforehand to, you know, end up with depositions on damages,

8  especially with regard to the experts.

9        **THE COURT:**  Well, with regard to those damage issues,

10  one of the things you were asking for is some sort of business

11  records from Live Face to show the money they've received by

12  way of licensing agreements or otherwise, as opposed to just

13  the agreement, the actual moneys they've received from various

14  other people who have used the 7.0 product or other products.

15        **MR. GRADY:**  Correct.

16        **THE COURT:**  All right.  And you haven't received

17  those?

18        **MR. GRADY:**  We have not.

19        **THE COURT:**  All right.  All right.  Let me hear from

20  Live Face a little bit, and then we'll come back to the

21  defense.

22        **MS. HASTINGS:**  Thank you, Your Honor.  Give me one --

23        **THE COURT:**  I'm sorry?

24        **MS. HASTINGS:**  Give me one second to just grab a few

25  things.

1      **THE COURT:**  All right.

2      **MS. HASTINGS:**  Let's just start where we left -- good

3  afternoon.  Let's start with that.  Good afternoon.  Let's just

4  start right where you left off, because I think, actually,

5  since we are here on motions to compel, I have a lot I can say

6  to respond to a lot of different statements that were made by

7  defense counsel, many of which I disagree with, many of which

8  are facts that I disagree with.  And I think that's something

9  Your Honor's already [inaudible].

10      But we might just need to get granular, because this

11  is actually a motion to compel documents.  And I have actually

12  had a hard time understanding what documents it is the defense

13  counsel wants from us, other than to have us withdraw all of

14  our objections and just produce every document of our company.

15      **THE COURT:**  Well, I appreciate your responses with

16  regard to that because it kind of indicates where the dispute

17  point is as to the terms of your objection, in terms of what

18  they've requested.  And I don't mind going through those with

19  you.

20      But I'm wondering about the three things I've

21  identified.  One was the communication to the copyright office.

22  And apparently you've provided some information.  You can maybe

23  describe that for me.

24      **MS. HASTINGS:**  Certainly.

25      **THE COURT:**  Second was the issue of these other

1  litigation -- and, I mean, I know there's a lot of -- the fact

2  that you've been listed as a plaintiff in a number of cases, I

3  don't think that shows that those cases are relevant. However,

4  I kind of was running from the basis of the multidistrict

5  litigation opinion since at least Mr. Rothman -- and I don't

6  know. You may have opposed concentralization on the basis of

7  the not being similar. That wasn't the basis the Court ruled

8  upon, which is -- they've said it looks easy enough to do this

9  without multidistrict litigation. So maybe I'm wrong about

10  that. And then, finally, this issue of 7.0 versus earlier

11  versions.

12        If you could address those three, maybe I'd kind of

13  know where I'm at. And then we can -- I'm happy to talk about

14  the specific responses you made both to the motion to compel

15  and/or to the request for production.

16        **MS. HASTINGS:** I also can speak to the fact that he

17  stated we haven't produced any financial documents, which --

18        **THE COURT:** Oh, okay. We can talk about them.

19  That's the damages issue, too. So thank you.

20        **MS. HASTINGS:** Okay. The copyright office.

21        **THE COURT:** Yes.

22        **MS. HASTINGS:** I went yesterday. And if this would

23  help the Court, I can give you a copy. I went yesterday and

24  just went ahead and indexed our entire production, just so I

25  have a real feel of everything we've given them, because we

have given them 1,577 documents, of which several are electronic files.

And I did scratch my head about the copyright office communications, because we have provided in LF0354 through 368, the copyright office public catalog, LF0369 through 371, those are all detailed.  Our letter to the Library of Congress for our application for 1.0.0, dated December 13, 2007.  I have this type of information itemized if that would help the Court.  We have given them all of our copyrights.  We've given them all the code.  It's all -- would you like to see a copy of this, Your Honor?

**THE COURT:**  No.  I don't need to see it.

**MS. HASTINGS:**  Okay.

**THE COURT:**  Here's my -- I mean, I'm happy for you to share that with them if you haven't before.  But here's my concern about that.  As I read the responses, you said, "Look, we will produce."  There's a lot -- "subject to our objections."  It's hard for me to identify there whether anything's been withheld or not.  And under the rules of --

**MS. HASTINGS:**  Nothing has been --

**THE COURT:**  So that's my question.  With regard to the stuff that you have in your copyright files, because you've had to go and get the copyright, has anything been withheld?

**MS. HASTINGS:**  No, Your Honor.

**THE COURT:**  That seems to solve that issue.

1      **MS. HASTINGS:**  Yes, Your Honor.

2      **THE COURT:**  And I take your representation -- on its

3  word.  That kind of --

4      **MS. HASTINGS:**  Yes.

5      **THE COURT:**  So they know what you have.  And if

6  Ms. Miracle responds -- or Mrs. Miracle or Dr. Miracle, I don't

7  know, I'm sorry about that -- looks at it and says, "That's not

8  enough," or, "This shows I'm right," or, "I'm wrong," that's

9  what it is.  It is what it is.

10     **MS. HASTINGS:**  Exactly, Your Honor.

11     **THE COURT:**  All right.  Very well.

12     So does this -- when you say this copyright file,

13  does this go to 7.0 -- the 7.0 version, or is this that that is

14  just another version of stuff that was originally copyrighted

15  at an earlier time?  Do you believe the earlier copyrighted

16  information is relevant or irrelevant to this case, the

17  copyright -- the seeking to copyright, putting aside the actual

18  claim, if you can.

19     **MS. HASTINGS:**  Yes.  No.  Absolutely.

20     **THE COURT:**  Okay.

21     **MS. HASTINGS:**  Version 7.0.0 is stand-alone

22  copyrighted.

23     **THE COURT:**  All right.

24     **MS. HASTINGS:**  It is unlike any of the other

25  copyrights that have been granted to my client and all of which

1 have been -- other versions have been provided to the other

2 side.

3      **THE COURT:** All right. So it didn't do one of these

4 things where we incorporate our other copyright?

5      **MS. HASTINGS:** No. And I --

6      **THE COURT:** I've seen that in copyright requests,

7 where they incorporate other copyrights and things like that.

8      **MS. HASTINGS:** I couldn't quite tell if that's what

9 was being argued --

10      **THE COURT:** Yeah.

11      **MS. HASTINGS:** -- by defense counsel. So what I

12 actually did yesterday was I did a diff comparison just of two

13 different versions of what 7.0.0 looks like. And I've got

14 copies of this. Here you go, Mr. Grady. This is a comparison

15 of 7.0.0 to 5.0.1. This is an example. And this is the

16 comparison to 6.0.1, just kind of an exemplar.

17      What's in white is what is identical. They are

18 not -- to answer your question directly, version 7 -- 6.0.1 is

19 not just 7.0.0 plus two lines. It is a totally stand-alone

20 copyright. It is completely different from any of the other

21 versions that have been granted a copyright by the copyright

22 office.

23      **THE COURT:** All right.

24      **MS. HASTINGS:** So to get to what I think is the

25 ultimate issue, therefore, we do not think that they are

entitled to discovery of every contract, every paystub, every

invoice, every canceled check, I think -- you know, a lot of

different information about every single other one of our

products that are driven by all of these other codes.

THE COURT:  All right.  To the extent that the people

have bought 7.0 from you and licensing agreements and

otherwise, have you provided that information to them?

MS. HASTINGS:  Yes, Your Honor.  That has been

provided to the other side in -- which he's referenced --

LFO -- and if you'll -- I would like to read this into the

record.

THE COURT:  That's fine.

MS. HASTINGS:  LFO-1 through 15 is the executed

license agreement with Veritech Holdings, Inc., dated January

14th --

THE COURT:  I'm sorry.  With what?

MS. HASTINGS:  Veritech Holdings, Inc.

THE COURT:  Okay.  Go ahead.

MS. HASTINGS:  Veritech's actually still hang

[inaudible] licensed beyond 7.0.0.  There's also the

executed -- LFO-63 through 77 is the executed license agreement

between LFO and Kelley Blue Book Company, dated September 8th,

2008.

THE COURT:  Okay.  Heard of them.  Go ahead.

MS. HASTINGS:  LFO-78 through 94 is the executed

agreement between LFO and Lexus, with Toyota Motor Sales, USA, Inc., effective November 8th, 2007.

Dr. Bratic, our expert, has actually evaluated [inaudible] three license agreements for version 7.0.0 in his rebuttal expert report, which has not been filed with the Court because it's attorneys' eyes only.

**THE COURT:** That's fine.

**MS. HASTINGS:** And I have a copy if you'd like to see one, Your Honor.

**THE COURT:** No. That's okay. I might need to at some point with regard to summary judgment.

**MS. HASTINGS:** Right.

**THE COURT:** But right now I'm just trying to get a picture of the discovery. Go ahead.

**MS. HASTINGS:** Absolutely understood.

And we have given them the license agreements for 7.0.0.

**THE COURT:** Okay. So here's then -- the pushback, as I understood it, from the plaintiff is, yeah, these might be the agreements. Can you show that you actually ever received any money from these people?

**MS. HASTINGS:** Yes.

**THE COURT:** So you have Veritech, Kelley Blue Book, Lexus. Show us those accounts receivable, those invoices, that information, checks or whatever to show that those payments

1  have been received.  Have you provided those documents as

2  opposed to just the licensing agreements?

3        **MS. HASTINGS:**  I've provided summary financial

4  information that lists monthly versus -- it has a line item for

5  monthly revenue for the licenses and revenue for single pay

6  products.  I'd be happy to show that to the Court.

7        **THE COURT:**  Okay.  Now I got to stop.  I got -- lost

8  you there.

9        **MS. HASTINGS:**  Sure.

10        **THE COURT:**  When you say single pay products versus

11  licensing products, is 7.0.0 one or the other, or is it both?

12        **MS. HASTINGS:**  Yes.  7.0.0 is licensed monthly.

13        **THE COURT:**  Okay.

14        **MS. HASTINGS:**  What Mr. Grady referenced earlier, a

15  price that he found on the internet, also referencing his

16  motion, 259.99, that is a different Live Face on Web product

17  driven by a different code.

18        **THE COURT:**  So for the 7 --

19        **MS. HASTINGS:**  We receive revenue from both.

20        **THE COURT:**  I got you.  But can you -- as opposed to

21  the summary info, can you provide them with actual -- a file

22  that says, here's -- because you have to keep them separate,

23  here's our 7.0.0 file for Veritech or Kelley Blue Book, and

24  here's all the money we received.  And can you provide that?

25        **MS. HASTINGS:**  I absolutely can provide that.  That

is the most particular request I received for it to date, and I would be happy to do it.

      **THE COURT:** I'm not -- I'm not in any way saying you did anything wrong in the past. I'm just trying to move forward so that --

      **MS. HASTINGS:** I agree.

      **THE COURT:** -- they have the documents. You know, I'm forward looking in this case as much as I possibly can be.

      **MS. HASTINGS:** I respect that.

      **THE COURT:** And it's difficult, I will say, for both parties -- it's been easier for plaintiff. You're going to know a lot more about the coding. I'm sympathetic to Mr. Moreno. He's not going to know. I guess I wished the third party was here. They probably would know a little bit more. I'm at a loss as to some of those, you know -- as you say, getting granular can be a little difficult.

      **MS. HASTINGS:** Right.

      **THE COURT:** But at least -- it may not be that they've requested it properly, but if they do request it properly, you're happy to -- or if I order it, you're happy to provide both -- for those where you have provided the license agreement, you're also happy to provide the income flow that shows the income following that agreement?

      **MS. HASTINGS:** Yes, Your Honor.

      **THE COURT:** All right. Very well. That seems like

1  that --

2      **MS. HASTINGS:**  I can provide that tomorrow.

3      **THE COURT:**  -- would be helpful.  Okay.  So that's

4  relative easy for you.  Because I was worried that it would be

5  difficult for your client --

6      **MS. HASTINGS:**  Well, I'm going to check --

7      **THE COURT:**  -- if they have a lot of these licenses.

8      **MS. HASTINGS:**  -- but I'm going to make them do it by

9  tomorrow.

10      **THE COURT:**  Okay.  Well, it doesn't have to be that

11  quick.  I just -- I don't want to put an undue burden on your

12  client.  On the other hand, that sounds like what would be

13  helpful for him to make a determination of what the appropriate

14  damage model would be with regard to 7.0.0.

15      **MS. HASTINGS:**  Thank you, Your Honor.

16      **THE COURT:**  Does that seem reasonable then to you?

17      **MS. HASTINGS:**  It does.  My only -- yes, it does.

18      **THE COURT:**  Okay.

19      **MS. HASTINGS:**  Today we've only been asked for it.

20  Absolutely that --

21      **THE COURT:**  I understand.  And we can go through

22  those objections.  If we need to, I'm happy to do that.

23          So let me ask you about then the other litigation.

24  That was the other matter.  I mentioned that there were 20

25  cases listed in the multidistrict litigation opinion that I

have reviewed.  How many -- now, those were not consolidated.

Those, at least at the time of December 9th, 2015, have not

been settled.  Have those gone forward?  Has there been

litigation on 7.0.0 to where there have already been some

depositions taken on either -- in either direction, or already

been some production?  Because I share the concern of the

multidistrict panel, that I want to try to avoid unnecessary

duplication of effort, either on your side or the side of the

defendant, if possible.

        **MS. HASTINGS:**  Thank you.  None of the cases I'm

involved in, Your Honor.  I don't know of any.  I have not --

this is the only case that I've produced documents in.

        **THE COURT:**  I see.  Okay.

        **MS. HASTINGS:**  We put them in a Dropbox and sent them

to the other side.

        **THE COURT:**  I see.  Okay.  All right.

        **MS. HASTINGS:**  There are no -- I've never had any

other depositions in any of the cases I'm on.  If you want me

to, I can go find out about other cases.

        **THE COURT:**  Okay.  Are there -- in addition -- okay.

Let me just ask you.  You're going to know a lot more about

this than me.  The 20 cases that are listed here, are they

7.0.0 cases?

        **MS. HASTINGS:**  Okay.  Well, the only -- so yes.  The

only way that there's ever going to be a Live Face on Web

1  case -- well, I mean, there could be other cases.  That's a

2  very broad statement.  But 7.0.0 is the only code that got

3  stolen.

4          **THE COURT:**  Oh, I see.

5          **MS. HASTINGS:**  Therefore, there's no -- Tweople stole

6  that code and resold that code to hundreds of other

7  customers --

8          **THE COURT:**  I see.

9          **MS. HASTINGS:**  -- that my client then found out

10  about.

11          **THE COURT:**  Okay.

12          **MS. HASTINGS:**  Sued Tweople.

13          **THE COURT:**  Okay.

14          **MS. HASTINGS:**  Tweople filed for bankruptcy.

15  Unfortunately, I believe the man who started Tweople has passed

16  away.  There is no way to gain any more information from

17  Tweople or to have Tweople satisfy any damages that have been

18  sustained --

19          **THE COURT:**  I see.  So now you're -- that's why it's

20  expanded in the way it has.

21          **MS. HASTINGS:**  So there will be -- I have never seen

22  a lawsuit based on 5.0.1, 6.0.2.

23          **THE COURT:**  I got you.

24          **MS. HASTINGS:**  Only 7.0.0 was stolen.

25          **THE COURT:**  Okay.  That then -- that's very helpful,

1  but it raises this concern, because the plaintiff has listed

2  either in reply or in their original motion a hundred cases,

3  more than a hundred cases, more than are in this multidistrict

4  litigation.  I guess all those cases actually do involve 7.0.0?

5          **MS. HASTINGS:**  Yes.

6          **THE COURT:**  How many lawyers does Live Face have

7  working for them on these very many cases throughout the

8  country?  Do you have any idea?

9          **MS. HASTINGS:**  I think actually most of them

10  concentrate in Florida because that's where Tweople was.

11          **THE COURT:**  I see.

12          **MS. HASTINGS:**  So the majority of them are in

13  Florida.  There's some in Georgia.  I have handled cases in

14  Texas, Illinois, Colorado, New York and Missouri --

15          **THE COURT:**  All right.

16          **MS. HASTINGS:**  -- personally.  So I can only speak to

17  those standing here, right now, before you.

18          **THE COURT:**  No, I understand.

19          **MS. HASTINGS:**  When we responded to the request

20  dealing with transcripts in other cases, the reality is the

21  liability in this case is very straightforward.  The

22  transcripts -- what transcripts there may be -- would probably

23  get into damages from the defendant because there is an option

24  to disgorge damages from the defendant in a copyright case.

25  That's one of the measures of damages for a plaintiff.  So

handing over a transcript regarding the financial information

of a defendant in California seems like it's really irrelevant

to Mr. Moreno's situation in his case.

**THE COURT:**  Do you know if on liability or

particularly -- Mr. Goldberg, your expert, has been deposed in

any of these many, many cases?

**MS. HASTINGS:**  I think Mr. Goldberg was deposed.

There was a -- I think he was deposed in another case, but I am

not the lawyer that handled that.

**THE COURT:**  All right.  You would see why it would be

relevant to have that deposition transcript if there is a

deposition transcript, because if they're going to ask the same

questions and Mr. Goldberg's already answered under oath on

something that can be helpful with regard to the question of

liability, that can be relevant.  No?  Maybe I'm wrong.

**MS. HASTINGS:**  No, I understand.  I think I

understand what you're saying, Your Honor.

**THE COURT:**  Yeah.

**MS. HASTINGS:**  It's just --

**THE COURT:**  I'm wondering if you can find that -- I'm

wondering if you can find that transcript.  And if not -- or

whether you should produce it or not.

**MS. HASTINGS:**  No.  I can find that -- I will find

the transcript.  I don't --

**THE COURT:**  Yeah.  But it may be that -- you're

1  saying it's not relevant, and I'm happy to hear from you.

2        MS. HASTINGS:  I just believe that the defense

3  attorneys want to take the deposition of Mr. Goldberg

4  independent of what's happened in any other case.

5        THE COURT:  Oh, I understand that.

6        MS. HASTINGS:  So I don't know that it's -- that they

7  are seeking some sort of streamlined attempt that is -- what

8  was in the interest of the multidistrict panel.

9        THE COURT:  I understand that.  But to the extent

10 that Mr. Goldberg's opinions, either in his report or when he

11 is deposed, in any way vary from that one, that would be -- it

12 sounds like that might be relevant.

13       MS. HASTINGS:  It might be relevant.  But may I add

14 one thing?

15       THE COURT:  Of course.

16       MS. HASTINGS:  Which is that Dr. Goldberg does not

17 churn out a report that is identical for each of the different

18 defendants because each of the defendants may have posted it in

19 a different way, maybe used a different infringing file.

20       THE COURT:  Yes.

21       MS. HASTINGS:  They copied 7.0, named it four

22 different things.  He actually has to do a case-by-case process

23 for each defendant that wouldn't necessarily be relevant to IP

24 Player JS, which was what was on Mr. Moreno's computer.  It

25 might have been in the other files that copied 7.0.0.  He has

to do a separate report for each of the defendants because

the -- and it's possible that out of the 469 lines that are on

7.0.0 -- which I'm sure you've seen them referenced in our

motion for summary judgment -- one defendant has identical 189.

Mr. Moreno has 189 lines that are identical to our 469, but

another defendant may have had 176 or 203.  There may be a

different proportionality of identicality between Live Face's

code and whatever the infringing code is for whatever

defendant's website it was.

So reading Dr. Goldberg's deposition might only tell

them how identical that, you know, www.abc.com's infringement

was to our 7.0.  But that's just --

**THE COURT:**  All right.  I understand.

All right.  Well, last thing I was going to say is

perhaps we could go through the terms of your -- the kind of --

you have general objections to a number of the motions -- the

requests.  Maybe we can see if I can resolve those and see then

what the plaintiff's response is.

But I've got an answer on the communications with the

copyright office, an answer with regard to the licensing

agreements and the money that would follow that, a little bit

of an answer with regard to -- I got an answer on 7.0.0 and

then a little bit of an answer with regard to the litigation.

And I'll hear from the plaintiff on all those.

But let's -- while we're here, let's go ahead and go

through some of your responses to the motions because you, as I understood it, grouped your responses to --

**MS. HASTINGS:** Oh, I see. You're talking --

**THE COURT:** Yeah. When you responded to the motions to compel, you'd say, look, this is the same objection in each one of these. And it seemed like that was relatively quick -- we could go through those relatively quickly.

**MS. HASTINGS:** May I just say one quick thing --

**THE COURT:** Yes, you may.

**MS. HASTINGS:** -- to the copyright office?

**THE COURT:** Of course.

**MS. HASTINGS:** I also believe, and I will check on this, that -- and if it is anything different, I can update the Court and, of course, opposing counsel.

**THE COURT:** Yes.

**MS. HASTINGS:** I also believe that communications of the copyright office are public. I believe that they are equally available to the other side, is one of my objections. I will obviously check over and make sure everything has been provided, but I know that's everything I have.

**THE COURT:** All right. That's fine. And, I mean, lots of times you'll have things -- there's a lot of -- a lot of litigation files will be public, too. But to the extent that it's somewhat easier for you to get and in the interest of moving it forward, I appreciate your efforts in trying to

provide those to the other side.

One -- if you look at the motion -- the response to the first motion, one of the issues was this question of whether we use the term video spokesperson --

**MS. HASTINGS:** Right.

**THE COURT:** -- or the issue -- we use 7.0.0.

**MS. HASTINGS:** That is very important. Yes, Your Honor.

**THE COURT:** Yes. Go ahead.

**MS. HASTINGS:** I realize that was a general objection. I also do include -- if you have a copy of our actual objections, I also object to the term in each of the individual objections --

**THE COURT:** Yeah, I saw that.

**MS. HASTINGS:** -- as vague and ambiguous. The first, while it seems minor, it is significant. Mr. Grady's actually defined the use of spokesperson is every item appearing on www.livefaceweb.com. My client operates a website at www.livefaceonweb.com. Just -- it's something to point out at the outset.

And it also just asks for every single product that is offered -- let's just call it livefaceonweb.com, because I know, of course, that's [inaudible]. That is a number -- that is 12 different products, all driven by different code that have been licensed to over 4,000 and 5,000 customers since

2011.  My client has 10,000 customers who [inaudible] some, of

course, he's had before 2011, which is the timeframe Mr.

Grady's asked for responsive documents.

That is -- that is -- first, it would be an

extraordinary burden on my client to produce them.  It's

basically everything in our entire company.

Second, I do not think it is relevant.  We are not

asserting that Mr. Moreno has bought and infringed any other

code embodied by any other product.

And what is also interesting is all of the code at

livefaceonweb.com, all of the products at livefaceonweb.com --

which it's no secret that livefaceonweb.com exists.  We've even

produced a screen shot from Live Face on Web in our production.

It has the 259.99 on it.  We are not trying to hide that there

are other products offered online.

What is important is that 7.0.0 is actually not

offered at www.livefaceonweb.com.  It's offered because the

people that wanted it back in 2007 asked for it, and our client

created the code for it.

**THE COURT:**  I see.  And then it was stolen by

Tweople --

**MS. HASTINGS:**  And then it was stolen.  But by the

time -- yes.

**THE COURT:**  Yeah.  I got you.

Well, with regard to customer agreements relating to

the software at issue in this case, do you have any objection

to providing those?

        **MS. HASTINGS:**  No.  And those are the three --

        **THE COURT:**  And that's the three.

        **MS. HASTINGS:**  -- that we've provided.

        **THE COURT:**  Okay.  Very well.  All right.  Go ahead.

        Then -- that was one of the issues that -- I mean,

that was the vast majority, as I understood, of the issues that

we had on the first request for production in the motion to

compel.  There may have been something else.  There was the

issue of the claim for attorneys' fees, but I think we can --

it's my general practice to allow, when necessary, that

discovery later, unless the parties really need it early for

some reason, like they're trying to work on a settlement or

some other reason.  But, I mean, I usually will allow that.

Usually there's not a lot of fight about that once the case

is --

        **MS. HASTINGS:**  Right.

        **THE COURT:**  -- done.  So was there other --

        **MS. HASTINGS:**  Or ones where they're the prevailing

party, the defendant.

        **THE COURT:**  Right.  That's the first issue.  And then

once they're there, usually we work those things out.

        I'm wondering whether you believe there's other

objections with regard to the first request for production that

1  you need to specifically talk about.  I'm happy to hear about

2  that.

3      **MS. HASTINGS:**  The major issue is just the fact that

4  most of them are couched in terms of asking for every product

5  that we have.

6      **THE COURT:**  But you're -- but you're happy to provide

7  the 7.0.0 because that's really what -- in your mind what this

8  is about.

9      **MS. HASTINGS:**  Your Honor, let me just take one more

10  quick look.

11      **THE COURT:**  Sure.  Of course.  Take your time.

12  That's fine.

13      **MS. HASTINGS:**  Yeah.  I mean, just every document

14  regarding our operations.  I really think resolving the issue

15  of video spokesperson handles a lot of the issues.  And we can

16  amend our responses if their -- if his requests were tailored

17  7.0.0, I can amend a lot of my responses.

18      **THE COURT:**  All right.  Then with regard to the

19  second motion to compel, I saw that we had the question of --

20  there was the issue for all transcripts, which we've just

21  talked about, all the transcripts in other cases.  We can put

22  that aside just for the moment until I hear from the other

23  side.

24      There was the issue of the language "tends to show,"

25  that was shown in three -- request for production 3 through 14.

If you read that as relevant, in other words, that sort of

tends to show that something is relevant when it tends to make

something more or less likely to be true as defined under Rule

401 of the Federal Rules of Evidence, would that -- does that

solve your problem, if we limit "tends to show" to mean

relevant within the terms of --

**MS. HASTINGS:** Yes.

**THE COURT:** Okay. And now, let me just press you on

this because there's some language in the recent rules -- the

amendments to the rules of discovery that came last year that

make it clear that things need to be relevant, but that doesn't

mean they need to be admissible. So it could be hearsay --

**MS. HASTINGS:** Right.

**THE COURT:** -- or it could be -- of course, if it's

subject to privilege, you're certainly entitled to put a

privilege on. But it could be subject to some other objection

besides relevancy. But if it's relevant documents, those are

things that could be --

**MS. HASTINGS:** Right.

**THE COURT:** Would that solve the response?

**MS. HASTINGS:** Yes, it would. I think that -- I

think a major issue -- this would all -- I mean, globally

there's just also an issue of the functionality. I just --

**THE COURT:** Sure.

**MS. HASTINGS:** I just need to take a look for one

```
 1   second --
 2           THE COURT:  Yeah, take your time.
 3           MS. HASTINGS:  I think I -- [inaudible] my actual
 4   responses.
 5           THE COURT:  Yeah.  Every one of the responses says
 6   "tends to show" is overall -- subject to this objection, we're
 7   willing -- we're going to produce, is kind of what it says
 8   every time, as I recall.
 9           MS. HASTINGS:  Yeah.  And the truth is, Your Honor,
10   we have given them the documents that we have.
11           THE COURT:  Okay.
12           MS. HASTINGS:  There is -- there is nothing that we
13   are withholding.
14           THE COURT:  All right.
15           MS. HASTINGS:  We are truly withholding the
16   information on every other product and every other code that is
17   not in this case, unless we think that that was requested --
18           THE COURT:  But you -- yeah, but you're not
19   withholding anything with regard to 7.0.0?
20           MS. HASTINGS:  Nothing.  In fact, we are glad to
21   produce the information about 7.0.0 --
22           THE COURT:  Except that it doesn't sound -- it
23   doesn't sound like you produced the actual invoices to show
24   payment by Veritech, Kelley Blue Book or Lexus.  But you're
25   willing to do that?
```

1      **MS. HASTINGS:** But I will provide the revenue for

2  each of those three, as we discussed.

3      **THE COURT:** All right. Very well. But go ahead.

4  You were going to look. I didn't mean to --

5      **MS. HASTINGS:** Oh, yes. Thank you.

6      **MR. LOPEZ:** Your Honor, while she reviews her notes,

7  I just had a quick question. When we talk about the documents

8  that show the revenue, you know, it seems like they're asking

9  for, you know, every scrap of paper that could be a deal, a

10  canceled check, anything that shows payment.

11      **THE COURT:** I'm assuming you have either invoices or

12  something that shows that you received -- that your client

13  received money. And if they're a business, they usually have

14  invoices or, you know --

15      **MR. LOPEZ:** We have discussed that with our client,

16  Your Honor.

17      **THE COURT:** -- payment, things like that.

18      **MR. LOPEZ:** We don't have every scrap of paper from

19  every payment going back six, eight, nine years throughout the

20  life of this transaction, the life of this case. But, you

21  know, we do have some of them. We just don't have it all. But

22  we wanted to make sure that --

23      **THE COURT:** Well, this case is a '15 case. So -- you

24  know, and I'm wondering -- you know, and maybe you don't have

25  all the way back to 2007. But you should have back a couple of

years or something that would show -- relevant to what -- this
gentleman had it, what would other people be paying if he had
gone and bought it from you at that time, that sort of document
and, you know, a series of payments.  If these are three active
clients, you ought to have it for the last couple of years.

      **MS. HASTINGS:**  No, no.  We'll get the document.  And
I just looked through all this, Your Honor.  If we can
[inaudible], we were to [inaudible] we do have [inaudible] as
being relevant rather than these [inaudible] tend to show, we
will amend our answers.

      **THE COURT:**  Okay.  All right.

      **MS. HASTINGS:**  And we will -- and we will have
produced everything else.

      **THE COURT:**  All right.  So you feel like you've
already -- there's nothing you withheld?

      **MS. HASTINGS:**  No.

      **THE COURT:**  To your knowledge?

      **MS. HASTINGS:**  To my knowledge.

      **THE COURT:**  All right.  And then, except that you
don't know about -- we were talking about the litigation, other
litigation because you're not in charge of those other
litigation --

      **MS. HASTINGS:**  Oh, right.  Well, that's not defense's
showing.

      **THE COURT:**  That's not defense's showing, yeah.

1      **MS. HASTINGS:** That I will -- I mean, I can find out.

2 I would say that what happens in every other litigation, I just

3 thought seemed like it was just trying to ask us for volumes

4 and volumes of --

5      **THE COURT:** All right. There's a lot -- a lot of

6 your objections were, look, you're asking us to marshal our --

7 the documents in our case. Lots of times that's an objection

8 to, we're not going to show you what our exhibits are yet. We

9 haven't figured out what our exhibits are.

10      **MS. HASTINGS:** Right. Right.

11      **THE COURT:** But if you're saying that the documents

12 that you have, from which your exhibits will be --

13      **MS. HASTINGS:** Right.

14      **THE COURT:** -- culled, you've already provided?

15      **MS. HASTINGS:** They've provided -- they been

16 provided.

17      **THE COURT:** That's -- that was my question. All

18 right.

19      And then with regard to the question -- the last

20 thing I had for you, and then I'll go back to the other side,

21 with regard to this series of depositions that we need to have,

22 the deposition of Dr. -- and I don't know, Nancy Miracle, and

23 then also -- it says Ms. Miracle here -- Ms. Miracle and then

24 Mr. Goldberg, do you think you can work out those dates for

25 deposition? Is there any issues?

1          **MS. HASTINGS:**  Well, I'm asking -- I've asked for the

2   depositions of Dr. Miracle and Mr. Norris.  I think maybe it's

3   Dr. Norris.

4          **THE COURT:**  Oh, that's right.  And that's the

5   other -- I'm sorry.  Uh-huh.

6          **MS. HASTINGS:**  Their expert.  We actually were only

7   provided with dates on February 9th and 10th, which is very

8   hard for the client because Mrs. Miracle is in Dallas, and they

9   only offered the next day in Santa Barbara for Mr. Norris.  And

10  that's logistically impossible, given the fact that we've had

11  this hearing and I've been working on the response, that you

12  graciously allowed me until the 9th to respond to, and we had

13  this hearing.  And I wanted to make sure things were ready --

14  our documentation, so I could keep track of what we've given

15  the other side.  I haven't been able to respond to Mr. Rothman

16  about that.

17         But I've given dates.  Mr. -- my client is being --

18  my corporate rep is being deposed here in San Antonio in two

19  weeks.  And my expert, Dr. Goldberg, is being deposed on the

20  18th -- on the 17th in New York.

21         **THE COURT:**  All right.  This is the reason I ask.

22  Right now we have a discovery deadline due of Valentine's.

23         **MS. HASTINGS:**  Right.

24         **THE COURT:**  And then the 28th for motions.

25         **MS. HASTINGS:**  Right.

1      **THE COURT:**  Relatively tight.  I'm wondering whether

2  you have any opposition to allowing the discovery process to be

3  complete before any further response to the motion for summary

4  judgment is filed.  I'd just as soon get all the discovery

5  done, and then you may be filing additional motions on damages.

6  I don't know.  But at that point -- let's get all this

7  discovery resolved, and then they can -- if they need to amend

8  their response to the motion for summary judgment, I can

9  consider it at that time.

10      And if so -- and then kind of -- that begs the

11  question I was really asking.  Do y'all need more time?  I'm

12  happy to work these matters out.  We're all here.  Let's do it

13  if we can and try to resolve that.  That's my question.

14      **MS. HASTINGS:**  I don't think -- I think more time

15  would be helpful if we've only been offered the two dates that

16  we've been offered for their clients' depositions, which is

17  quite close to February 14th, which was going to necessitate

18  figuring something out that's creative.

19      So we would like -- we may need more time, Your

20  Honor, yes.  I think what you're asking me is am I willing to

21  allow the other side until February 14th or whatever date we

22  determine is the end of discovery, extend their motion for

23  summary judgment on mine --

24      **THE COURT:**  Amend their response, yeah.  Because

25  they've asked to defer because he was claiming that there was

some issues.  They've now said that recently they've discovered

that.  Just as soon hear that as opposed -- and get all the

information in before me so I can rule at once.

**MS. HASTINGS:**  Right.  I don't think there is

[inaudible] on any more information that they need because, you

know, we all might need a little bit more time to get

everything done.  And I like to be agreeable.  I would like to

offer that accommodation, but I don't think there's anything

more that they need on liability.  But if the Court would like

us to wait till the end of discovery for them to be allowed to

amend their response, that is perfectly fine with me.

**THE COURT:**  All right.  Thank you.  And I appreciate

your responses.

Let me hear from the plaintiff a little more as to

some of these matters.  I think we've moved closer to some

resolution.  I'll warn the parties.  I got about 20 more

minutes, and then I have to go.  But I think we can get

everything done.  I'm very hopeful.

**MR. GRADY:**  Your Honor, on scheduling, we are also

waiting for a date for Bratic, who's recently designated -- of

January 4th.  And, I mean, not that we're -- you know, we're

going to present our experts, but that still has to be done.

We haven't received a date.  We've asked for a date.  So we're

waiting for that date.

Also, it hasn't been brought up, as well, is that,

1  you know, we also plan to file our own motion for summary

2  judgment.

3          **THE COURT:**  Right.  I'm assuming that's -- yeah.

4          **MR. GRADY:**  You know, I mean --

5          **THE COURT:**  That often happens in these cases.

6          **MR. GRADY:**  Right.  And, you know, we were just

7  waiting till we got -- finished discovery.

8          You know, on the video spokesperson -- and, you know,

9  this is -- you know, it is an important issue.  If there is no

10  difference between the codes and the versions of the codes,

11  then, you know -- in function, I mean -- I mean, yes, it's my

12  understanding that the difference of the coding is one enables,

13  for example, the web browsers.  Each web browser does not tell

14  the video player what it is.  It doesn't say, hello, I am

15  Internet Explorer.

16          So for each version there has to be different code

17  which talks to the web browser and has some kind of -- you

18  know, I don't know how this works at all.  But somehow there's

19  a conversation with that web browser.

20          And, of course, there's all kinds of browsers.

21  There's different devices, mobile.  So these -- this -- my

22  understanding is the difference -- the core difference, at

23  least from a technical coding standpoint, between the software

24  and -- but it's Live Face's position, and as presented in

25  Bratic's expert report, paragraph 42, that the difference

between a single pay licensee versus a monthly licensee who

uses 7.0 -- because only 7.0 is done monthly, as I understand

it -- is based upon the terms of use.

And I have that here.  And I would -- I think it's

very enlightening, and it's based just on an interview with the

CEO, Shcherbakov.  So, you know, the reason we want discovery,

though, is to kind of ferret out this claim that, "Oh, 7.0 is

so different."  And, in fact, there's only two current

customers who were paying on the monthly, Toyota -- at least as

far as we know, although we don't have evidence of payment.

The other one, Lexus, I think, canceled after -- before the end

of the first year.

And the willingness of people and the number of

people willing to pay the single pay for this product versus

the monthly licensing is directly relevant to the issue of the

fair market value, because no willing buyer, or very few or

maybe -- you know, I don't know the rationale behind these two

supposed -- alleged customers.

But, I mean, it kind of goes to the heart of their

case in a sense.  And that is -- is that no willing buyer is

going to pay for such a simple product at such a high monthly

licensing price.  Now, if there's all these services included,

then I could understand.  So in sum, that's the reason.  And we

feel that that's highly relevance -- relevant evidence to our

defense.

THE COURT: Well, I guess this is my question, and I
think they've just -- I think you just stated your defense by
the evidence that I think they're going to have -- the
discovery they're going to have to provide. If there's only
three clients and only two of them are still paying, that's all
you're going to need to show the jury. No one's buying this
product. If no one's buying this product, why should we be
paying this exorbitant fee? We didn't do it. Someone else
stole it. We didn't even know we stole it. And you're making
us pay this exorbitant fee for something that no one else
wants.

Doesn't that show -- the fact that there's only two
people in the whole country -- of the thousands of clients,
there were only two people that are buying this, doesn't that
prove your point?

MR. GRADY: Well, and we -- but we have no -- well,
and maybe. Yeah, I guess. That sounds good to me. But we
don't have any record of additional clients. How many people
are paying the monthly fee?

THE COURT: Well, I think we have a statement by your
colleague that there aren't any. That was it. They were the
three. You had three license agreements, and they're willing
to produce the documents that show that they're paying them --
what they paid.

MR. GRADY: I'm sorry. I meant how many people --

the number of people that are paying the single fee license,

which isn't a license.  It's just a one-time fee.  Like, how

many people?  Are there 5,000 customers who are paying -- who

paid 3,000 one-time fee for this, you know, web spokesperson.

And then there's like -- we don't know how many people.  I

mean, it may be -- I guess maybe it's not directly relevant to

our case.

        **THE COURT:**  Well, I mean -- I mean, that could be an

alternative.  If they say, well, we can't prove that anybody's

buying the licensing agreement, but we still want the money you

have to pay to buy the one-time fee.  But they're not saying

that.  They're saying, we want the license agreement.  If they

can't prove that, they're out of luck on that -- on that model.

        **MR. GRADY:**  Yeah.

        **THE COURT:**  And it may be that -- you know, that's --

they've made the decision to go with that.  That's their

decision.

        **MR. GRADY:**  Well, I guess we would use that evidence

just to show what the fair market value actually is.  But I

guess --

        **THE COURT:**  I understand.

        All right.  What do you think about -- what about

this issue about the copyright office?  They say, "Look, this

is a stand-alone.  It hasn't incorporated other copyrights.

We've given you everything we have."

1     **MR. GRADY:**  Oh, that's fine.  You know, I mean, and
2  this goes to a broader, you know, point on --

3     **THE COURT:**  All right.  Very well.

4     **MR. GRADY:**  -- on their responses, is that a lot of
5  our objections is that we just don't -- that's fine to produce
6  everything.  Although they didn't identify -- with some of the
7  stuff it's not so easy to draw a line from, you know, this
8  Bates label range document to this response.

9     **THE COURT:**  Let me ask you about that.  They give us
10  that -- they gave you that -- or they -- your colleagues cited
11  an index that listed what was responsive to various documents.
12  Did you provide a copy --

13     **MS. HASTINGS:**  No.  That's just my own personal index
14  I created of everything that we have produced.

15     **THE COURT:**  Is that index -- does it show which
16  request for production?

17     **MS. HASTINGS:**  It doesn't refer to which.  It's just
18  everything identified --

19     **THE COURT:**  All right.  If you -- there was a request
20  from the defense, "Hey, which documents were responsive," can
21  you answer that question?  Is it too difficult to do?  It's
22  1,500 pages.  It may be difficult.  At least with regard to the
23  copyright question, that should be --

24     **MS. HASTINGS:**  Well, I can give them the Bates number
25  to the copyright.  I have never --

1     **THE COURT:**  Okay.  All right.

2     **MS. HASTINGS:**  I can give them the Bates range for

3  every copyright.  And, in fact, actually, they have it in their

4  own pleadings as well.  They know what the copyright --

5     **THE COURT:**  Oh, which --

6     **MS. HASTINGS:**  I mean, they created their own chart

7  as well.  It's in their pleading.  And they know what's been

8  provided to the copyright office.  I can also reiterate what's

9  been provided to the copyright office from our production.

10    **THE COURT:**  All right.

11    **MR. GRADY:**  Well, and, Your Honor --

12    **THE COURT:**  Go ahead.

13    **MR. GRADY:**  -- just to give you an example, like on

14  the second RFP --

15    **THE COURT:**  Thank you.  Go ahead.

16    **MR. GRADY:**  -- there's a request.  It's, you know, do

17  you have any evidence that Moreno was aware of the copyright

18  infringement?  And there's a response.  But it's not -- it's

19  not, you know, open and shut.  They leave it, you know,

20  hanging.

21    And there's an objection to it.  So, you know, just

22  say -- we just want a responsive -- there's no withheld

23  documents.  Do you have any evidence -- which I'm pretty -- I

24  know that they don't.  But, you know, I think -- and that's --

25  I believe that's required under the rules.  If you assert an

1 objection to a request, you know, you should say, well, you

2 know, I'm withholding documents behind the objection, whatever,

3 you know --

4       **THE COURT:**  That was one of the amendments that I

5 thought was a very helpful amendment to the rules of civil

6 procedure last year.  It's my understanding from your colleague

7 that, in fact, they're not withholding anything.

8       **MS. HASTINGS:**  And we just resolved -- that was one

9 of the ones we just resolved.  It's the "tends to show," and we

10 just resolved how --

11       **THE COURT:**  Oh, if it's -- yeah.  Oh, thank you.

12 Thank you for reminding me.  If "tends to show" is meant to be

13 relevant, in other words, relevant documents.

14       **MR. GRADY:**  Yeah.

15       **THE COURT:**  On that list they say they are happy with

16 that.  They're happy to amend their response to say, we've

17 provided every relevant document.  Does that resolve that

18 narrow question?

19       **MR. GRADY:**  Do we get a formal amendment to the

20 response?

21       **THE COURT:**  Yeah.  Amended response.  Sure.

22       **MR. GRADY:**  Okay.  Okay.  I wasn't clear on that.

23       **THE COURT:**  Sure.  Okay.

24       **MR. GRADY:**  Yeah.  I know it's kind of ticky tack,

25 but I just wanted to get a formal, you know --

1          **THE COURT:**  All right.

2          **MR. GRADY:**  -- response on the record.

3          **THE COURT:**  And then let me ask you, with regard to

4    the scheduling.  It's my general intent to allow you to get the

5    discovery done and then deal with the motions, even though the,

6    you know, plaintiffs say, "Look, our motion's ready to go right

7    now."  That happens sometimes in cases.  A motion for summary

8    judgment gets filed early because we've given up everything we

9    have, and we think we've got liability knocked down or whatever

10   the issue might be.

11          If I allow you to complete discovery, maybe with some

12   more time, I want to hear from you on that, by the close of

13   discovery, do you think you'd be able at that point then to

14   respond fully, if necessary, by way of an amended response to

15   the motion for summary judgment?

16          **MR. GRADY:**  Absolutely.  Absolutely.

17          **THE COURT:**  All right.  Plus, then filing whatever

18   motion you may have as well.

19          **MR. GRADY:**  Yes.  Of course, our own motions.

20          **THE COURT:**  All right.

21          **MR. GRADY:**  But yeah, we would like just a little bit

22   more time, especially with Bratic's deposition, too.

23          **THE COURT:**  I was going to propose -- and let me hear

24   from the parties.  I was going to propose a discovery deadline

25   of March 14th, a month later, and a motions deadline -- I was

going to -- two weeks after discovery for motions strikes me as

not a good idea.  I'll just be frank with you.  Because you may

need transcripts from your depositions.  And if you don't have

a transcript, it's very hard to file one of those motions.

So I was going to make it a month.  So March 14th, or

if that's a weekend, the following Monday, and April 14th, or

if that's a weekend, the following Monday.  And then have that

motions deadline also be the deadline by which you file any

response to -- I'm sorry.  Two weeks would be the deadline for

you to file a response.  So then the only date -- for the

motion that's pending.

The danger there, I want to be -- this is what I need

to talk to the plaintiffs about.  I don't want a situation

where you're having to respond to both motions at the same

time.  I don't want -- or you having to file both motions at

the same time.  I don't want people to get doubled up.

So what is y'all's view as to how to, in an orderly

way, get all the responses done?  I do not want -- there's no

reason to make you go crazy, have to respond to a motion and

file a motion on either side.  I want to be -- give you the

time you need to get that done without, you know, putting aside

all your other work just to handle this one case.

**MS. HASTINGS:**  Did you say something about two weeks

for his?  Can you say that one more time?

**THE COURT:**  Well, that's the danger.  Typically I

1   would say two weeks for him after the -- you know, he's got --

2           **MS. HASTINGS:**  Close of discovery?

3           **THE COURT:**  -- discovery, to file his response.

4           **MS. HASTINGS:**  Right.

5           **THE COURT:**  Or he had responded -- file his response

6   by the motions deadline, but then you'd be replying to his

7   response and responding to his motion.  And so --

8           **MS. HASTINGS:**  That's fine.

9           **THE COURT:**  Is that okay?  All right.  Well, then

10  that's what I'll do.  I'm going to make my -- I'll make the

11  March 14th, or the next Monday, the discovery deadline; April

12  14th, or the next Monday, the motions deadline; require that

13  you file any supplemental motion to -- response for the motion

14  for summary judgment that's been filed already by the motions

15  deadline.

16          **MR. GRADY:**  Okay.

17          **THE COURT:**  And then you'll have your normal response

18  time, reply and response.

19          **MS. HASTINGS:**  Okay.

20          **THE COURT:**  If people need more time, I'm easy about

21  that, subject to we need to get the case moved.

22          **MS. HASTINGS:**  Which, may I ask, just in that vein --

23          **THE COURT:**  Okay.

24          **MS. HASTINGS:**  -- when does the Court issue a trial

25  setting?  Is that something that you would want to rule on all

1   the motions?  What's your typical procedure for time that

2   parties --

3            **THE COURT:**  I'd like to look at all the motions.

4            **MS. HASTINGS:**  Okay.

5            **THE COURT:**  Yes.  Before I set the trial deadline.

6   Because I need to know -- I'll be very frank.  We're way

7   burdened right now.  We're down on some judges here.  We

8   have -- one of our San Antonio judges is handling the Waco

9   docket and the Austin docket.  Another one of our San Antonio

10  judges is handling the Midland docket.

11           And so, as a result, the San Antonio docket's being

12  handled a lot more by us magistrate judges.  And for that

13  reason, there's some delays.  And so I need -- I kind of want

14  to look at what I'm looking at to see how much time I believe

15  it's going to take, when I'll be able to get to your motions,

16  because I want to rule on the motions before we get anywhere

17  near trial --

18           **MS. HASTINGS:**  Okay.

19           **THE COURT:**  -- so that you can prepare.  So that's my

20  ten -- that's my general practice.  If y'all need a hard date

21  earlier, I'm happy to provide it.

22           **MS. HASTINGS:**  No.

23           **THE COURT:**  But it's easier for me to do it that way.

24           **MS. HASTINGS:**  Just wanted to know your procedure.

25           **THE COURT:**  Okay.  Anything further from -- I mean, I

1    kind of have a picture of -- my practice is usually to rule on

2    motions to compel from the bench, follow up with a written

3    order.  And so I've got a good picture of where we are right

4    now, but there may be additional arguments that you wanted to

5    make on behalf of -- on either of these motions for the

6    defense.

7            **MR. GRADY:**  No.  I think that's it.

8            **THE COURT:**  All right.  Very well.  Thank you.

9            **MS. HASTINGS:**  May I consult just for one moment with

10   my local, and then I might have one more --

11           **THE COURT:**  Of course.  Absolutely.  No.  Let's get

12   everything resolved while we can.

13          **MS. HASTINGS:**  -- I might have one more thing to say,

14   but I know we only have like ten more minutes.

15          **THE COURT:**  No.  That's all right.

16     (Discussion off the record)

17          **THE COURT:**  All right.  Anything else from the

18   plaintiffs?

19          **MS. HASTINGS:**  I just wanted to -- just for one

20   moment, just because I think Mr. Grady said something that has

21   just mischaracterized our products, just -- he said there's no

22   difference in the code, and I just want to make sure that I

23   vehemently oppose that because there's --

24          **THE COURT:**  That's fine, for -- I mean, that'll be an

25   issue for litigation.  You provided me with documents showing

what you understand to be the differences of the code but --

        **MS. HASTINGS:**  Right.  And --

        **THE COURT:**  That's something that we'll need experts about to help us resolve.

        **MS. HASTINGS:**  Right.

        **THE COURT:**  So you're not waiving --

        **MS. HASTINGS:**  And that's why -- and that's why we think --

        **THE COURT:**  You've not waived -- you haven't waived anything.  Don't worry.

        **MS. HASTINGS:**  Okay.  Thank you.

        **THE COURT:**  All right.  I thank the parties for their presentations.  It was very helpful.  Was there something else?

        **MR. LOPEZ:**  No, sir.

        **THE COURT:**  Okay.  Just so that I can get a picture of where we were with regard both to the liability issues and the damages issues in this case.  The two motions, the first motion and second motion to compel will be granted in part and denied in part as follows.

        I'm going to require that the defense -- I'm sorry -- the plaintiffs provide any financial information showing the income stream from the three product -- three licensing agreements they have for version 7.0.0.  That's the Veritech, Kelley Blue Book and Lexus.

        I'm going to also require that they amend their

1   responses to make clear that all relevant documents have been

2   provided as to both motions to compel.

3           I will also require that the plaintiff determine

4   whether -- get copies of transcripts of any depositions of

5   their expert, Mr. Goldberg.  And to the extent that those are

6   relevant to the issues in this case, they have to disclose

7   those, as oppose -- if you need me to resolve whether they're

8   relevant or not, I can.  It would be the Court's preference

9   that you just disclose the deposition and let them figure out

10  if it's relevant or not.  And then you can make your relevancy

11  objections as needed at the time of the deposition.  It's a lot

12  easier that way.  But if you need me to resolve it in advance,

13  I'm happy to do that.

14          I would ask that the -- all those responsible -- the

15  additional documentation, the amended responses and the

16  depositions be provided two weeks from today.

17          Does that sound reasonable to the plaintiffs?

18          **MS. HASTINGS:**  Yes, Your Honor.

19          **THE COURT:**  All right.  That would be the 24th of

20  January.

21          **MR. GRADY:**  The Goldberg deposition is set for the

22  17th.

23          **THE COURT:**  Oh, all right.  In advance -- the

24  Goldberg then -- the transcripts in advance of that deposition,

25  and the other documents by -- within two weeks.  Is that all

```
1  right for the plaintiffs?

2           MS. HASTINGS:  Yes, Your Honor.

3           THE COURT:  All right.  Very well.

4           I'm going to extend the discovery deadline to March

5  14th, which is a Tuesday; extend the motions deadline till

6  April 14th, which is a Friday; and then require that the -- any

7  additional response to the currently pending motion for summary

8  judgment be filed by that motions deadline of April 14th.

9           I think -- any other requests that have been made are

10 denied.  Given the legitimate disputes the parties have, no

11 expenses or attorneys' fees or any of that are going to be

12 granted with regard to these motions.

13           Anything further from -- since it's the defense

14 motion, let me ask them first.  Anything further from the

15 defense at this time?

16           MR. GRADY:  Are there any deposition transcripts of

17 Dr. -- or not doctor -- of Walter Bratic, the other expert?  He

18 may have been a damages -- he's their damages expert in this

19 case.  We didn't really discuss --

20           THE COURT:  Yeah.  We didn't get into any more

21 detail, but it doesn't sound like there are.

22           MS. HASTINGS:  No.

23           THE COURT:  All right.  So I don't think there are.

24           MR. GRADY:  Okay.  All right.

25           THE COURT:  All right.  Very well.
```

1          Anything further from the plaintiffs?  Have I

2  resolved -- any other issues that are out there that you need

3  to --

4          **MS. HASTINGS:**  No.  Thank you, Your Honor.

5          **THE COURT:**  All right.  Very well.

6          See, we got done in time.  I appreciate the parties'

7  presentations.  I will file a short order that memorializes the

8  rulings of the Court today.  If for any reason that order is

9  not clear or ambiguous or incorrect as what I said on the

10 record to your understanding, please let me know.  Happy to

11 provide an amended order.

12         **MS. HASTINGS:**  Thank you.

13         **THE COURT:**  That concludes proceedings on this case

14 at this time.  We'll be in recess.

15 * * *

16     (End of proceedings at 4:13 p.m.)

17

18

19

20

21

22

23

24

25

-oOo-

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


Date:  2/16/2017

/s/ Chris Poage_____
United States Court Reporter
655 East Cesar E. Chavez Blvd., Rm. 314
San Antonio, TX  78206
Telephone:  (210) 244-5036