1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3   LIVE FACE ON WEB, LLC,        )
    a Pennsylvania Company,       )
4                                 )
         Plaintiff,               )
5                                 )
            vs.                   )   Docket No. SA-15-CV-539-OLG
6                                 )
    DANIEL MORENO, Individually )     San Antonio, Texas
7   and d/b/a FULL SERVICE        )    April 6, 2017
    VENDING CO.,                  )    10:07 a.m. to 10:57 a.m.
8                                 )
         Defendant,               )
9                                 )
            vs.                   )
10                                )
    VENDCENTRAL, a California     )
11  Company,                      )
                                  )
12       Third Party Defendant. )
    _____)
13              TRANSCRIPT OF MOTION HEARING
14       BEFORE THE HONORABLE HENRY J. BEMPORAD
               UNITED STATES MAGISTRATE JUDGE
15
    A P P E A R A N C E S:
16
    FOR THE PLAINTIFF:
17       STANDLY & HAMILTON, LLP
         By:  Kevin N. Colquitt, Esquire
18       325 North St. Paul Street, Suite 3300
         Dallas, TX  75201
19
         LOPEZ SCOTT, LLC
20       By:  Orlando R. Lopez, Esquire
         3707 N. St. Mary's Street, Suite 200
21       San Antonio, TX  78212

22  FOR THE DEFENDANT:
         SHEEHY WARE & PAPPAS, PC
23       By:  Shawn Michael Grady, Esquire
         909 Fannin Street, Suite 2500
24       Houston, TX  77010

25

```
 1   FOR THE DEFENDANT (APPEARING BY TELEPHONE):
          SCHNEIDER ROTHMAN INTELLECTUAL
 2        By:  Joel Benjamin Rothman, Esquire
          4651 North Federal Highway
 3        Boca Raton, FL  33431-6348

 4   COURT RECORDER:  FTR Gold

 5   TRANSCRIBER:
          CHRIS POAGE
 6        United States Court Reporter
          655 East Cesar E. Chavez Blvd., Rm. 314
 7        San Antonio, TX  78206
          Telephone:  (210) 244-5036
 8        chris_poage@txwd.uscourts.gov

 9   Proceedings reported by electronic sound recording, transcript
     produced by computer-aided transcription.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Open court at 10:07 a.m.)

2                    **COURT SECURITY OFFICER:**  All rise.

3                    **THE COURT:**  Good morning.  Please be seated.

4                    **COUNSEL:**  Good morning, Your Honor.

5                    **THE COURT:**  Calling the case of SA-15-CA-539.  That's

6    Live Face on Web, LLC, versus Daniel Moreno.  If I could have

7    announcement of counsel, please.

8                    **MR. COLQUITT:**  Kevin Colquitt on behalf of Live Face

9    on Web.

10                   **THE COURT:**  All right.

11                   **MR. LOPEZ:**  Judge, Orlando Lopez on behalf of the

12   plaintiff as well.

13                   **THE COURT:**  All right.

14                   **MR. GRADY:**  Shawn Grady, counsel for defendant Daniel

15   Moreno.  And on the phone is my co-counsel, Joel Rothman.

16                   **THE COURT:**  All right.  Mr. Rothman, can you hear the

17   proceedings?

18                   **MR. ROTHMAN:**  I can -- I can hear it faintly, but I

19   will try to follow it.  And I appreciate Your Honor allowing me

20   to listen in.

21                   **THE COURT:**  All right.  We'll turn it up as loud as

22   we can on the phone.  I am loathe to have phone conferences for

23   this reason.  Our technology is just not good enough to make

24   decent recordings when we have hearings.  So if you need to say

25   anything during the hearing in addition to what your co-counsel

1   has to say, I'll just ask you to speak up.  And I may have to

2   ask you to repeat, sir.

3           MR. ROTHMAN:  Okay.  Well, and I appreciate that,

4   Your Honor.  I had every intention of being there, but all of

5   the flights in and out of Atlanta yesterday were canceled and I

6   was [inaudible].

7           THE COURT:  All right.  Very well.  Hopefully, if you

8   need to say anything, I can hear you and you can hear me.

9           We are set -- y'all may be seated.  We're set today

10  on what was three motions, but I believe one of them is moot.

11  There's two motions from the defendant.  That's a motion to

12  compel production of financial documents and then an amended

13  motion to compel settlement agreements.

14          I think the motion to compel production of financial

15  documents is moot because it's identical to the other motion,

16  just with a different title.  Is that correct, Mr. Grady?

17          MR. GRADY:  That's correct, Your Honor.

18          THE COURT:  All right.  Very well.

19          Okay.  So the docket entry 81, that's the motion to

20  compel production of financial documents, will be denied as

21  moot.  And we can move on to the other one.

22          Meanwhile, there's also a plaintiff's motion.  That's

23  to maintain the confidential designation of certain testimony

24  given by the corporate representative, docket entry 87.

25          MR. COLQUITT:  Yes, Your Honor.

1          **THE COURT:**  So I figure we'd just take them in the

2     order filed.  So let me first hear about the defendant's

3     motion -- or amended motion to compel settlement agreements.

4          **MR. GRADY:**  Thank you, Your Honor.  Defendant's

5     motion to compel settlement agreements is based upon the

6     one-satisfaction rule.  And I'm going to walk the Court through

7     point by point in why the one-satisfaction rule applies to the

8     facts of this case.

9          **THE COURT:**  All right.  Well, let me just pause -- I

10    want to make sure you received the document I received.  I

11    think it was yesterday.  A notice of election to seek only --

12    not to seek statutory damages in the case.  So you'll need

13    to -- I'm wondering, in light of that, whether that changes

14    what your argument would be or whether you think that's an

15    ineffective document or what so --

16         **MR. GRADY:**  Right.  Thank you for the reminder.

17         **THE COURT:**  All right.  Just wanted to make sure you

18    have it.  All right.  Go ahead.

19         **MR. GRADY:**  Yes, yes.  Thank you for the reminder.

20         Okay.  So the first point is that copyright protects

21    exclusive rights.  Under Section 106 of the Copyright Act those

22    rights are defined, and they're itemized as follows.  "One, to

23    reproduce the copyrighted work.  Two, to prepare derivative

24    works of the copyrighted work.  And three, to distribute copies

25    of the copyrighted work.

1          LFOW, or Live Face, claims that these exclusive

2   rights were violated simultaneously by Tweople and Mr. Moreno.

3   In the suit against Tweople, Live Face claims that Tweople

4   copied and distributed Live Face's software to hundreds of

5   Tweople's customers, including Mr. Moreno.

6          And I have here an excerpt or paragraph from their

7   petition which I think will easily summarize their claim in the

8   scenario that they're alleging that they were -- that their

9   copyright was violated.  Live Face alleges that Tweople copied

10  its software code and then used that code in video spokesperson

11  projects Tweople sold to its customers for use on the

12  customers' web sites.

13         Live Face claims that each time a web browser

14  retrieves a page from a customer of Tweople which contains a

15  Tweople video, a new copy of the infringing code is

16  automatically distributed to the website visitor.

17         The remaining defendants are alleged to be customers

18  of Tweople who purchased videos spokesperson projects

19  containing the infringing software codes whose web sites

20  operate using the infringing software code and who use the

21  software to advertise their products and services.

22         Live Face seeks injunctive relief and damages for

23  direct and indirect infringement of its copyright rights in

24  violation of the statute, Copyright Act.

25         In this scenario Tweople violated Live Face's

1   reproduction right and distribution rights under Section 106

2   every time it sold a video spokesperson project to a Tweople

3   customer, such as Mr. Moreno.  And every time Mr. Moreno uses

4   the software he bought from Tweople, Mr. Moreno violates the

5   same reproduction right and distribution right that Tweople

6   violated.

7         Thus, Tweople and Moreno are jointly and severally

8   liable for allegedly violating Live Face's distribution and

9   reproduction rights as to the code distributed to Moreno.

10  Moreno is a joint tort feasor and jointly and severally liable

11  with Tweople because Moreno acted under the direction of and in

12  concert with Tweople.  It's undisputed that he bought his video

13  from Tweople unknowingly and put it on his website."  That's

14  the allegations that Live Face has made.

15        And further, it also distributed to its customers,

16  Mr. Moreno did, by posting on his website when they download

17  it.  So there's a further distribution.

18        However, Moreno is not jointly and severally liable

19  with Tweople for other violations of Live Face's exclusive

20  rights committed without Moreno's participation.  Live Face has

21  filed over 130 lawsuits in the United States and Canada, most

22  are against customers, such as Mr. Moreno, of Tweople.  Moreno

23  can only be responsible for the infringement he committed with

24  Tweople at Tweople's direction or using Tweople's software.

25  Moreno cannot be held responsible for the infringement by

1   Tweople involving others, and Live Face has sued and settled

2   with.

3          Live Face is only entitled to one recovery for one

4   wrong.  A plaintiff is only entitled to one recovery for a

5   wrong, and payments made in partial satisfaction of a claim are

6   credited against the remaining liability."  And finally, "Live

7   Face treats Moreno as if Moreno was responsible for the wrong

8   committed against Live Face by Tweople.

9          Since our last hearing, we've taken the deposition of

10  plaintiff's damages expert, Mr. Walter Bratic.  And consistent

11  with his report, he bases plaintiff's claims for lost -- for

12  actual damages based upon a lost licensing fee model.  And

13  he -- and to support his opinion, he looks to three enterprise

14  license agreements, and he examines those.  And clearly, the

15  agreements as contemplated are designed for the licensee to buy

16  the right to -- and own the software code in order to use that

17  software code on other web sites, just like Tweople did.

18          You know, but what's obvious is that Mr. Moreno had

19  no such intention and did not have such a use.  His use was --

20  and his deposition, of course, has been taken -- was just to

21  put it on his website to sell to his customers, not for use on

22  other web sites.

23          Live Face ignores that model because that would only

24  give them -- entitle them to damages for like $300.  Instead,

25  they want to have their cake and eat it too.  And they want to

1    treat Mr. Moreno like he would -- like as a client -- corporate

2    client who had -- who would enter into one of these enterprise

3    license agreements.

4          And since they want to treat -- and their damage

5    model, as they assert, is under this enterprise license

6    agreement, the applicability of the one-satisfaction rule is

7    appropriate.

8          Alternatively, if they were to seek a single payee's

9    license damage model, that would be different.  And, you know,

10   then probably the one-satisfaction rule would not apply.

11         **THE COURT:**  All right.  It seems to me that you're --

12   I got the argument how if they had settled with Tweople,

13   whatever money Tweople paid them would be satisfying it.  Why

14   would we -- somebody else?  There's a hundred suits for however

15   many, somebody in Canada or wherever they are.  Why would that

16   be joint with yours?

17         They haven't claimed joint liability on that.  Mr. --

18   whether legal -- they may be wrong that Mr. Moreno was a

19   licensor to redistribute this code as opposed to a one-time

20   user or using it just on his one website.  But whether they're

21   right or wrong doesn't seem to have anything to do with why

22   you'd have to give those other settlement documents to you.

23         Tweople, if there was some settlement documents or

24   anything with Tweople, I could see it.  But why -- what about

25   the other hundred people they might be suing?

```
 1            MR. GRADY:  That's a good question.

 2            Mr. Rothman?

 3            THE COURT:  This is why -- it's the telephone.

 4            Mr. Rothman, did you hear my question, sir?

 5            MR. ROTHMAN:  Yes.  Your Honor, if Live Face on Web

 6   was going to treat Mr. Moreno as if he is just like Tweople,

 7   then Mr. Moreno should be entitled to discover the settlements

 8   in the other cases.

 9            THE COURT:  No.  Let me just -- if I can --

10            MR. ROTHMAN:  [Inaudible].

11            THE COURT:  If I can, let me push you on that, sir.

12   This is -- if they're treating him like Tweople because

13   Mr. Moreno redistributed it to Mr. Moreno's customers, if they

14   had settled with any of Mr. Moreno's customers, then they'd be

15   entitled to all of those settlements.  But if Tweople did

16   something with somebody in Michigan that has nothing to do with

17   Mr. Moreno, why would that be relevant in any way to your case?

18   That'd be my question.

19            MR. ROTHMAN:  You've made our argument, Your Honor,

20   as to why the damages model that Live Face on Web has put

21   forward in the case should not apply.  But discovery is broader

22   than simply whether something is relevant.  And in this case,

23   because Live Face has come out and said that they're entitled

24   to recover all of the damages associated with the use of the

25   code as if Mr. Moreno was a user like a Tweople or the other
```

licensed enterprise users, that then forces us to -- should

that claim be sustained, it forces us to seek the discovery in

order so that we can understand what all of these other users

in Moreno's -- in a similar situation to Moreno, what all did

they pay?

        Because, otherwise, we'll get to trial and Live Face

will say, "Well, Mr. Moreno, you're responsible for these huge

sums of money," and we won't have the ability to show that

these different defendants in other cases already satisfied

that claim.

        So it would be -- it would be great to have a

decision from Your Honor that said that, you know, the

claims -- the damages claim that Live Face is making does not

apply to Mr. Moreno.  But we haven't reached that point yet.

        **THE COURT:**  All right.  Thank you, Mr. Rothman.

        All right.  Let me hear from the plaintiffs on this

motion before we get to the second issue.  I'm about -- so I'm

about to ask you the exact same question I just asked your

colleagues.  If Tweople sold something to somebody in Michigan,

this license -- your product to someone in Michigan, is

Mr. Moreno liable in any way for what happened with the sale to

Michigan, the company in Michigan?  And even though Michigan's

using that stuff through Tweople, is there any way that this

defendant has to pay that money?

        **MR. COLQUITT:**  Good morning.

1          **THE COURT:**  Good morning.  I'm just driving right in,

2     and I apologize.

3          **MR. COLQUITT:**  Yes, sir.  Yes, Your Honor.

4     Mr. Moreno's not liable for anything that happened in Michigan

5     with another person who infringed my client's code by

6     purchasing through Tweople.

7          **THE COURT:**  All right.  And all of the time --

8          **MR. COLQUITT:**  One has nothing to do with another.

9          **THE COURT:**  Right.  And all the times that Tweople

10     sold it to all these other people and ripped your client off --

11     I mean, that's my understanding of your claim.

12          **MR. COLQUITT:**  Yeah.

13          **THE COURT:**  -- Mr. Moreno's not reliable -- not

14     responsible or liable in any way for that.  He's responsible

15     for his relationship with Tweople, getting it from Tweople and

16     then using it.  That's it.

17          **MR. COLQUITT:**  Yes, sir.  The only damages we're

18     seeking in this matter --

19          **THE COURT:**  Okay.

20          **MR. COLQUITT:**  -- are the actual damages associated

21     with the code appearing on Mr. Moreno's website.  It has

22     nothing to do with anybody else's website anywhere in the

23     nation, only Mr. Moreno's website.

24          **THE COURT:**  All right.  Now, is there any sort of

25     settlement with Tweople that's out there in any way?

1          **MR. COLQUITT:**  No, Your Honor.

2          **THE COURT:**  What's going on with that, with Tweople?

3          **MR. COLQUITT:**  Tweople --

4          **THE COURT:**  Are they -- are they defunct or --

5          **MR. COLQUITT:**  Well, I'm sorry to -- I didn't mean to

6     interrupt you.

7          **THE COURT:**  No.  No.  That's all right.  I'm a little

8     interrupting you, sir, and I apologize.  Please go ahead.

9          **MR. COLQUITT:**  No.  Tweople is bankrupt, and there

10     was no settlement with Tweople.

11          **THE COURT:**  All right.  Is there any lawsuits by your

12     company against anybody who accessed Mr. Moreno's website, such

13     that that code was redistributed to them?

14          **MR. COLQUITT:**  No, sir, not that I'm aware of.  I

15     don't think there's --

16          **THE COURT:**  All right.  If there are any, you would

17     disclose any settlements or even any litigation with any of

18     those people, I'm assuming, to your colleagues?

19          **MR. COLQUITT:**  Yes, sir.

20          **THE COURT:**  All right.  Just checking.

21          Now, I just -- those were my questions I asked him.

22     It seems fair to ask you the same questions.

23          **MR. COLQUITT:**  Yes.

24          **THE COURT:**  I'm happy to hear any other arguments you

25     want to make, sir.

1          **MR. COLQUITT:**  Well, once defendants admitted that

2     there's no joint and several liability -- that they don't

3     have -- disclaiming any joint and several liability with any

4     other defendant to another's lawsuit, I think it really

5     disposes of the motion.  Because without joint and several

6     liability, those other settlement -- the one -- in order for

7     the one-satisfaction rule to apply, there has to be joint and

8     several liability.  So without joint and several liability,

9     there is no one-satisfaction rule, and their whole argument of

10    why these settlement agreements are relevant is really moot.

11         **THE COURT:**  All right.  All right.  Thank you.

12         Mr. Rothman, like I said, it's hard for me to hear

13    you and you to hear me.  I have no idea if you heard anything

14    that the plaintiffs just argued.  But I'm happy -- maybe your

15    colleague here in the courtroom -- if they have any response on

16    that motion before we get to the next one, I'm happy to hear it

17    so --

18         **MR. ROTHMAN:**  I did hear counsel, Your Honor.

19         **THE COURT:**  Oh, good.  I'm glad to hear that, sir.

20    Go ahead.

21         **MR. ROTHMAN:**  I did hear counsel, Your Honor.  And

22    it's comforting to know that Live Face's claim is limited in

23    the way that has been described.

24         It still leaves open the question of why Live Face's

25    damages claim is being made based upon licensing agreements

that are so factually different from the defendant's use and
are akin to the use put to them by Tweople.  But for the
purposes of this motion, I think that we [inaudible] with it.
And then we simply need to raise the issue of the basis for
their damages claim by way of either a motion in limine or a
motion for partial summary judgment.

        **THE COURT:**  All right.  That makes sense to me.  I
understand that, and thank you very much.  It seems to me --
and, you know, I will -- I will tell you, Mr. Rothman, your
colleague here, I'm going to hold the plaintiff to their
representations in this court as to what exactly their model
is.  So if something different happens in front of the jury,
I'm going to call it -- y'all are going to need to remind me,
and we're not going to let that happen.  We're going to stick
with the way we are right now.

        **MR. COLQUITT:**  Yes, sir.

        **THE COURT:**  And plaintiff is standing up to say
that's absolutely true.

        **MR. COLQUITT:**  That's absolutely true.  And I just
wanted to make sure that we're clear for the record what I was
limiting the model to.

        **THE COURT:**  Okay.

        **MR. COLQUITT:**  And the model -- our damages model is
based on actual damages associated with our client's code
appearing on Mr. Moreno's website and no other websites around.

1          **THE COURT:**  Yeah.  All right.  Very well.

2          **MR. COLQUITT:**  Okay.

3          **THE COURT:**  All right.  So let me turn to then the

4    next motion, which is the question of a confidential

5    designation, or really it's the attorney's eyes only

6    designation of portions of the deposition testimony of the

7    corporate representative for plaintiff.  And I'll hear from the

8    plaintiff on that.

9          **MR. COLQUITT:**  May I proceed?

10          **THE COURT:**  You may.

11          **MR. COLQUITT:**  Okay.

12          **THE COURT:**  I'm sorry to be speaking so loud.  I'm

13    doing it for purposes of the telephone.

14          **MR. COLQUITT:**  No, I understand.  Thank you, Your

15    Honor.

16          **THE COURT:**  Okay.  Go ahead.

17          **MR. COLQUITT:**  Basically, defendants and plaintiffs

18    asked the Court to enter a confidentiality and protective order

19    in this matter.  The confidentiality and protective order had a

20    very specific definition of attorney's eyes only information.

21    It includes financial information, customer identity.  Even

22    though it doesn't expressly say "negotiations," I think

23    negotiations fall under the category of financial negotiations

24    that occur.

25          The deposition testimony that we seek to -- so they

took our client's -- our client's corporate representative

deposition.  During the deposition, the client spoke

extensively about the identity of customers, the negotiations

of licensing agreements and the specific prices charged in

those licensing agreements.

       **THE COURT:**  Three customers particularly, as I

understood it?

       **MR. COLQUITT:**  Three customers particularly.

       **THE COURT:**  Yeah.  Go ahead.

       **MR. COLQUITT:**  And so we designated those as

attorney's eyes only, as permitted by the protective order that

the defendant asked this Court to enter.

       We think there's good cause to maintain those

designations.  And our client is a business -- in the business

of selling its code to people around the country.  And if it

has its pricing information disclosed to the public, its

customer identity disclosed to the government or its

negotiation tactics disclosed to the public, it can put them at

a competitive disadvantage.

       **THE COURT:**  All right.  Now, this is where I need to

pause you.  And that's why I was trying to be specific about

what exactly the motion was about.

       **MR. COLQUITT:**  Yeah.

       **THE COURT:**  I didn't think the motion was about

disclosing this outside the terms of the protective order.

1  What I understood the motion was about was whether it's

2  attorney's eyes only or whether the party can see it and --

3  because I would -- I'm kind of whiffy on, this can't go out --

4  this is confidential information under the protective order.

5  Whether you designate it as simply confidential or as

6  attorney's eyes only, which is a different designation --

7            **MR. COLQUITT:**  Yes.

8            **THE COURT:**  -- is the question I think is before the

9  Court at this time.  Maybe I'm wrong.

10           **MR. COLQUITT:**  No.  That's a fair characterization --

11           **THE COURT:**  All right.  So then tell me --

12           **MR. COLQUITT:**  -- of the relief we're seeking.

13           **THE COURT:**  All right.  So then why would giving it

14  to -- these attorneys would be under that protective order.  If

15  they were to disclose it -- and Mr. Moreno.  If they were to

16  disclose it, they'd be in contempt.

17           **MR. COLQUITT:**  Okay.

18           **THE COURT:**  And they'd be in serious trouble with me.

19           **MR. COLQUITT:**  Okay.

20           **THE COURT:**  So why would I -- why would we not allow

21  the party to see it, as opposed to the attorneys?

22           **MR. COLQUITT:**  Okay.  So first, there is a definition

23  within the protective order.  So it's my understanding that

24  because there's a protective order -- it's a standard

25  protective order used in this district --

```
 1              THE COURT:  It is.

 2              MR. COLQUITT:  -- that there is good faith for --

 3     there's a good cause reason for categorizing that type of

 4     information as attorney's eyes only.  We have basically two

 5     reasons why Mr. Moreno shouldn't see it.

 6              THE COURT:  All right.

 7              MR. COLQUITT:  One, it's really not relevant to any

 8     claim in this matter.  He doesn't need to review my client's

 9     personal information -- or confidential information in order to

10     testify about any point that's relevant to this trial.  They

11     try to make the point that he needs to see what other people

12     paid to say what he would have been willing to pay for the

13     licenses.  But he could read the terms of licenses, and he

14     could make up whatever number he wants to make up.

15              Second --

16              THE COURT:  The idea being, if I may pause you there

17     again, is that the reason is that it's an objective standard as

18     to the willing buyer, as opposed to the subjective intent of

19     any particular defendant --

20              MR. COLQUITT:  Precisely, Your Honor.

21              THE COURT:  -- when you're talking about licensing,

22     the fee?

23              MR. COLQUITT:  Yes.  When you're talking about fair

24     --

25              THE COURT:  That's your argument?
```

1          **MR. COLQUITT:**  -- when you're talking about fair

2    market value, the determinations and objective standards.

3          **THE COURT:**  Got you.  All right.  Making sure I

4    understand the argument.  Thank you.  Go ahead.

5          **MR. COLQUITT:**  Okay.  As far -- the second reason is

6    it came to our attention in an email produced by a third-party

7    defendant, VendCentral, in this matter, that Mr. Moreno sent a

8    veiled threat to them regarding this lawsuit in which he

9    confessed an association with a very serious -- very serious,

10   with a Mexican Mafia capo who was charged with killing a police

11   officer and had confessed to an association I think with 14

12   other killings.

13         If Mr. Moreno is displaying that kind of willingness

14   to retaliate and an association with someone who might be

15   having the capability to enter that kind of retaliation, my

16   client has serious concerns about having his information, which

17   the Court seems to agree is confidential and shouldn't be made

18   public, given to Mr. Moreno.  And I don't know whether the

19   threat of contempt, given that association, is enough to deter

20   Mr. Moreno from any kind of retaliatory action.

21         **THE COURT:**  Well, threatening another party in a

22   lawsuit by way of email is a federal crime.  It's a federal

23   felony.  And so if that's the issue, why would that be

24   different of -- disclosing anything to him?  Why isn't -- why

25   haven't y'all gone to the U.S. Attorney's office?  Why aren't

```
 1  we -- this would be a very serious matter that would be taken

 2  up whether or not we disclosed information about these three

 3  contracts.  That's a much broader and much more serious thing.

 4  It doesn't have anything to do with these contracts, does it?

 5          MR. COLQUITT:  Well, I think it's further -- we

 6  didn't file our motion -- original motion based on that email.

 7          THE COURT:  All right.

 8          MR. COLQUITT:  The email came to our attention after

 9  we filed the motion.  The purpose that we filed the motion was

10  based on the definition of attorney -- or attorney's eyes only

11  within the protective order and our desire to keep it away from

12  Mr. Moreno.

13          And there's no relevance for him to see it.  It fits

14  the definition of the order, and we didn't see any need for him

15  to actually see the information.  So we're just asking the

16  Court to enforce our rights under the Court's order, and that's

17  the reason we filed the motion.

18          THE COURT:  All right.

19          MR. COLQUITT:  The email which came to our attention

20  subsequently and we thought that it brought further concern

21  about giving any kind of information to Mr. Moreno, frankly,

22  but in the context of the most sensitive information, that

23  would be the information we would most want to keep out of his

24  hands, if anything.

25          THE COURT:  All right.  Very well.  Thank you, sir.
```

1              **MR. COLQUITT:**  Thank you.

2              **THE COURT:**  Let me hear from the defense on this

3    matter.

4              **MR. GRADY:**  Regarding the email, which I haven't --

5    I've never seen this email.  But assuming that it exists,

6    Mr. Shcherbakov attended Mr. Moreno's deposition, and he was

7    anything but scared.  I think that's -- that shows how much --

8    how seriously he took that threat, if it was made.

9              As far as the designation, plaintiff fails to mention

10   that preventing defendant's counsel from discussing these

11   agreements, which their actual damage model is solely based

12   upon, will prejudice our ability to present our defense to this

13   damage model at trial, which I think is a very good reason to

14   allow us -- and, of course, it will still be protected under

15   the protective order.  So, you know -- and not to mention that

16   Mr. Moreno is not a competitor.  I mean, his knowledge of these

17   agreements means -- what can he do with this information?  I

18   mean, it's -- and these --

19             Not to mention, these agreements are old.  Two of

20   them Kelley Blue Book canceled in 2009.  That's eight years

21   ago.  And Lexus canceled in '11 or '12.  Although we don't have

22   any actual information to verify when Lexus canceled.  That's

23   just based upon statements of Shcherbakov.  The only one we

24   know that they actually -- is a current client is Veritech.

25             But, I mean, I just don't -- you know, there's just

 1   no danger here, just looking at it from a practical standpoint.

 2          **THE COURT:**  Well, let me ask you about the threat

 3   first.  It's Exhibit Number 1 to their reply.  Have you not had

 4   a chance to look at the threat?  It's a letter -- it's an

 5   email -- appears to be an email from sodavendor@sbcglobal.net

 6   to Neil Swindale at VendCentral.  I don't know -- I mean, I

 7   don't know what that means.

 8          **MR. GRADY:**  Yeah.  VendCentral is a third-party

 9   defendant.  I don't -- you know, in all honesty, Your Honor, I

10   thought Joel was going to argue the motion.  So that's why I

11   haven't read that.  I didn't look at the exhibit, so I

12   apologize for that.

13          But Mr. Moreno is an eccentric guy, and he is angry

14   about being sued.  But I've met with him several times.  He's

15   not dangerous, I mean, clearly.  And Mr. Shcherbakov went to

16   the deposition and, you know, was anything but afraid.  I mean,

17   the opposite, really.  But, you know, I just -- I have zero

18   concern.

19          **THE COURT:**  Well, let me -- let me ask Mr. Rothman,

20   if he can hear.  Have you, Mr. Rothman, had any conversations

21   with attorneys for VendCentral or the -- I don't -- or the

22   party himself, Mr. Swindale?  Has there been any investigation

23   into this matter?  This was -- this email appears to be sent

24   over a year ago.

25          **MR. ROTHMAN:**  I haven't heard, Your Honor, any

concerns raised to me by Live Face on Web concerning this email or any other activity involving Mr. Moreno or VendCentral. I've been involved in several other cases brought by Live Face who [inaudible] representing three or four different defendants in other districts.

You know, Live Face has on several occasions in other cases counterclaims against -- excuse me -- filed additional claims against defendants when they exercised their First Amendment rights off-line to tell the public about the claims that Live Face makes.  And if this was an issue that really concerned Live Face, it certainly would have raised it previously.

We don't -- we obviously don't condone threats, and we don't condone, you know, this type of behavior.  I don't see, you know, what relevance it has to an issue of whether or not Mr. Moreno was entitled to see documents so that he can testify on his own behalf as to whether or not the terms or license agreements with [inaudible] corporations [inaudible] and would have sought out and agreed to if he were in this position of a willing buyer and willing seller discussing the potential licenses.  It's just not relevant.

**THE COURT:**  All right.  Let me ask you about that, or I can ask your colleague here in the courtroom as well.  The argument of the plaintiffs, as I understand it, is that the question of willing buyer, willing seller is an objective test,

1  not a subjective test, so that Mr. Moreno's subjective view

2  that this particular pricing model was too high, too low,

3  whatever, is not relevant.  The question is more of an

4  objective test of what would a reasonable buyer do?  Do you

5  disagree with that, or what's your view on that?

6          **MR. ROTHMAN:**  I don't agree with it a hundred

7  percent.  And here's the reason.  It goes back to our

8  conversation before.  The terms of the license agreements with

9  these three large corporations [inaudible] that plaintiff is

10  attempting to use as a basis for its damages model are

11  licensing agreements, the terms of which are relevant to

12  whether or not Mr. Moreno would have accepted them.

13          He is entitled to be asked at the trial of this case,

14  "Mr. Moreno, would you have had the ability to pay X?  Would

15  you have needed the terms of the licenses to be broad enough to

16  add these features to other websites of yours?  Do these even

17  apply to you?  How are you alike or how are you different from

18  big corporation A, big corporation B, big corporation C?"

19  These are relevant and permissible questions, and they go to

20  whether or not the plaintiff can base damages upon these

21  licensing agreements without the ability for Mr. Moreno, like I

22  said -- and Your Honor noted, we're not asking to expose these

23  to the public.  We're asking that we be allowed to discuss the

24  actual terms, parties, the amounts and the testimony regarding

25  them with Mr. Moreno so that Mr. Moreno can prepare for trial

1   and prepare to testify on these issues.

2          These are issues that the jury's entitled to receive.

3   I can't imagine that -- in presenting a damages claim,

4   rebutting it, that Your Honor would say, "Well, we don't -- we

5   don't think that Mr. Moreno's view on this is really relevant,"

6   which is essentially what they're arguing.  It must be

7   relevant.  It must be, and it is.

8          THE COURT:  All right.  One more question.  Let me

9   ask you -- and I neglected to ask this of the plaintiffs but I

10  will as well.  Wasn't Mr. Moreno entitled to be at this

11  deposition if he wanted to?

12         MR. ROTHMAN:  The deposition of Mr. Shcherbakov?

13         THE COURT:  Yeah.

14         MR. ROTHMAN:  He could have been there, except for

15  the fact that he would have been asked to leave the room during

16  the testimony because, you know, the entire transcript was

17  designated as highly confidential, attorney's eyes only.  And

18  it was only because [inaudible] inquiry and asked them to

19  reduce the designations of portions of the transcripts where

20  Mr. Moreno could see them, that opposing counsel filed this

21  motion in order to maintain those designations.

22         THE COURT:  All right.  And would it be portion --

23  this is the reason I'm asking.  It seems to me like part of

24  what your argument is, is -- you know, it's not a criminal

25  case, but even in a civil case a defendant has a due process

 1  right to be confronted with the evidence against him and meet

 2  that evidence.  And wouldn't that include being at a deposition

 3  if that deposition testimony is essential then to later what is

 4  presented to the jury?  I mean, it seems to me like he had a

 5  right to be there.  And if they were to exclude him, we'd be

 6  talking about his right to be there.  Mr. Rothman?

 7        **MR. ROTHMAN:**  Oh, I'm sorry.  I didn't realize you

 8  were asking me that question.

 9        **THE COURT:**  Yeah.

10        **MR. ROTHMAN:**  I agree with you.  I agree that he did

11  have the right to be there.  And I think he should be entitled

12  to read the testimony.

13        **THE COURT:**  All right.

14        **MR. ROTHMAN:**  I think we should be entitled to

15  prepare our case by asking him whether the details that

16  Mr. Shcherbakov testified to at his deposition regarding these

17  licenses, whether these things are relevant to whether or not

18  he would have licensed the software under these terms.

19        I believe he should be entitled to see the licensing

20  agreements in full, including the license fees, licensors and

21  all of the features of the license, all the rights that would

22  be licensed in order so -- in order so that from a due process

23  perspective, as Your Honor said, he can evaluate those and be

24  able to provide his testimony as to whether or not those

25  licenses are relevant to him and his small business.

1        **THE COURT:**  All right.  Yeah.  Mr. Rothman, that was

2   a softball question for you.  It's really a hardball question

3   to your colleagues on the plaintiff's side.  So I'm going to

4   ask that to them right now.

5        **MR. ROTHMAN:**  Okay.

6        **THE COURT:**  I could see why you were wondering who I

7   was asking.  But yeah, I mean, it seems to me isn't defendant

8   entitled to confront the witness?  The corporate rep is the big

9   witness against him in a case like this.  He's entitled to be

10  there, to confront, to hear what he has to say and see if it's

11  true or not, or all the other things that meeting the evidence

12  against you means in a due -- under the due process clause.

13  Let me ask you, sir.

14        **MR. COLQUITT:**  Yes, Your Honor.  And, obviously,

15  Mr. Moreno has constitutional due process rights.  We do not

16  deny that.

17        However, the Court -- the Court's confidential and

18  protective order, which is a standard form used by the Western

19  District of Texas -- and I consider it presumptively

20  constitutionally compliant.  And I haven't seen any

21  constitutional challenge to it on a due process basis.  Under

22  the plain terms of the agreement there is certain information

23  that a party to a lawsuit, a defendant to a lawsuit isn't

24  entitled to see if it meets that definition.

25        And that's what we have here, is we have a definition

of attorney eyes only information, that information that we're seeking to protect and maintain the attorney's eyes only designation clearly meets.  This is the first time I've heard anyone raise a constitutional challenge to the protective order.  So I haven't done the research of the case law, you know, to be able to articulate fully what my argument would be. But I think there is a presumption of constitutionality.

**THE COURT:**  It's the Court raising it, so there's no reason you would be prepared to -- on that question.  I'm just wondering.  And it's not so much -- it's different -- let me just ask you.  This is the thing that's different.  Typically the protective order covers documents in production, requests for production of documents, other material that is exchanged between the parties under Rule 26.

When it gets time for a deposition, usually the plaintiff is there when the defendant's witnesses are deposed, and the defendant's representative is there when the plaintiff's witnesses are deposed.

**MR. COLQUITT:**  Yeah.

**THE COURT:**  Because that's typically not where you -- where you put -- you'd put a protective order in place to kick one of the parties out of -- out of the room when the deposition's being taken.  You would say that's an unusual or not the typical way this is used, this order?

**MR. COLQUITT:**  Yes, Your Honor.  I would agree with

1  you on that.

2     **THE COURT:**  All right.

3     **MR. COLQUITT:**  However, I am given to understand that

4  this testimony was elicited using documents that were

5  designated as attorney's eyes only.  So if you can simply use a

6  document at a deposition that has attorney's eyes only

7  information, legitimate attorney's eyes only information to get

8  around the attorney eyes only requirement, then their

9  attorney's eyes only designation really has no teeth because

10  it's simple to get around it by using the document at a

11  deposition.

12     So, once again, I think we're back to the fact, this

13  is just an analysis of whether the standard court order for the

14  Western District of Texas is constitutionally compliant with

15  the due process clause.  And I believe it is.

16     **THE COURT:**  All right.  Thank you.

17     That raised one more question for Mr. Rothman.  I'm

18  sorry to go back and forth.

19     **MR. COLQUITT:**  Sure.

20     **THE COURT:**  And sorry I'm talking to Mr. Rothman, but

21  it seems like that's the only way to get this done.

22     Mr. Rothman, are you arguing then not only that the

23  deposition -- in opposition to the designation of the

24  deposition testimony as attorney's eyes only, but you're also

25  objecting to the designation of the underlying documents as

```
 1  attorney's eyes only?
 2          MR. ROTHMAN:  Yes, we are, Your Honor.  The
 3  deposition testimony was based upon the documents.  And so I
 4  can't see how there could be a ruling consistent with
 5  Ms. Moreno's rights to allow him to see one and not the other,
 6  because the testimony about the -- about the licenses was based
 7  on those licenses.
 8          And, again, there are adequate safeguards in place.
 9  And as you noted, counsel is obligated under the protective
10  order as well.  We certainly would not do anything that would
11  subject us to sanctions, and we'll treat this information with
12  the care necessary.
13          It may not even be necessary for Mr. Moreno to have
14  copies of the actual documents, but we do need to speak to him
15  about them.  And under the current designation, we can't -- we
16  can't speak to him about them at all.  And that's not only
17  fundamentally unfair, but it prejudices our ability to be able
18  to defend the case.
19          THE COURT:  All right.  Very well.
20          Yes.  One more point from the plaintiff.  Go ahead.
21          MR. COLQUITT:  Your Honor, just a couple of points
22  they made on the --
23          THE COURT:  Sure.
24          MR. COLQUITT:  -- their response that I'd like to
25  address.
```

1          First, let's be clear.  There's nothing preventing

2     the attorneys for Mr. Moreno from seeing these documents.

3     They've already been disclosed in unredacted versions.

4          Second, there are unredacted -- there are redacted

5     versions available for Mr. Moreno to review.  The redacted

6     versions simply hide customer identification information and

7     specific pricing information.  So Mr. Moreno can see these

8     licensing agreements.  He can review all the terms in them, and

9     he can state whether he would have been -- what he would be

10    willing to pay for those documents.

11         And he doesn't need to see what someone else paid to

12    say what he would be willing to pay.  And, you know, it's even

13    possible for counsel maybe, as long as the question wasn't

14    objectionable, to ask, "Would you be willing to pay $10,000 a

15    month?  Would you be willing to pay $4,000 a month," to get the

16    testimony that they claim they need before the jury.  So

17    there's no need for him to actually see the redacted portion of

18    the information.

19         Third, as part of the deposition testimony elicited

20    based on these documents, my client testified about his

21    negotiation techniques used in negotiating these license

22    agreements.  There's absolutely no need for Mr. Moreno to

23    understand my client's confidential negotiation techniques and

24    is not relevant to this -- any fact before this Court that you

25    or the jury will have to determine.

1          And so in sum, Mr. Moreno can see the terms that are

2     relevant to his case.  There's no need -- the attorneys have

3     full access to these documents, so there's no prejudice to

4     their ability to prepare the case.  Their experts have seen the

5     documents.  He said they're not relevant to his calculation of

6     fair market value, but he had an opportunity to see the

7     documents himself.

8          And last, Mr. Moreno has made -- appears on this

9     email to have made threats related to this lawsuit.  And my

10    client has concerns about someone who's making threats with

11    connections to serious mob figures having access to his

12    sensitive information.

13         **THE COURT:**  All right.  Thank you, sir.  All right.

14    Very well.

15         Well, after consideration of the parties' arguments

16    on both sides with regard to the plaintiff's motion for an

17    order to maintain the confidential designation of certain

18    testimony of plaintiff's corporate representative, it sounds to

19    me like it's actually a more expansive issue than that.  It's

20    not just the testimony but also the unredacted documents on

21    which that testimony is based.

22         The Court is going to -- I guess I'm going to deny

23    the motion but grant it to this extent.  I do want the

24    documents to remain confidential.  However, they do not -- and

25    the testimony.  However, I do not believe they need to be for

 1   attorney's eyes only and so will deny that portion of the

 2   motion.

 3          In the Court's mind the protective order that has

 4   been in place in this case is -- allows documents to be

 5   identified as -- for attorney's eyes only, including the

 6   documents that have been so designated here, but it is not

 7   requiring.  And in this case I believe Mr. Moreno has a right

 8   to at least review those portions that have been redacted and

 9   review the testimony with his attorneys in preparing his

10   defense.

11          However, I will direct the attorneys for the

12   defendant not to provide copies with -- of those documents to

13   Mr. Moreno.  I believe, to just doubly ensure that they remain

14   confidential, which I do believe they do need to remain

15   confidential, I will ask that those be only reviewed at

16   counsel's offices or when counsel is visiting with Mr. Moreno,

17   and that counsel keep any copies of those documents and any

18   copy of the deposition transcript.

19          I hope I'm -- let me start with the defense.  Is that

20   clear what I'm directing?  Mr. Rothman?

21          **MR. ROTHMAN:**  It is, Your Honor.

22          **THE COURT:**  All right.  Very well.

23          And, of course, I'll have a follow-up order that

24   hopefully captures what I just ruled on.

25          With regard to this issue of the threat, this is an

```
 1  important issue of great concern to the Court.  It does not
 2  seem directly relevant to this motion in my mind.  That would
 3  be a broader -- a broader concern, and I would need to hear
 4  from the third-party defendant on that matter as well.  If this
 5  is a matter that the plaintiffs wish to present to the Court in
 6  some other form, I'll be awaiting that motion.  But I'm going
 7  to want to hear from the third-party defendant since that
 8  email, apparently from last year, was directed to the
 9  third-party defendant in this case.
10          So that means -- I think that resolves everything.
11  The first motion is denied.  That was the motion to compel
12  settlement agreements, for the reasons already stated.  And
13  this motion is -- I want to say granted in part and denied in
14  part because I am going to limit some of the access to these
15  documents.
16          Anything further from the plaintiff at this time?
17          MR. COLQUITT:  No, Your Honor.
18          THE COURT:  Anything further from the defense at this
19  time?
20          MR. GRADY:  No, Your Honor.
21          THE COURT:  All right.  Mr. Rothman, anything
22  further?
23          MR. ROTHMAN:  Your Honor, I'm not sure if you noted
24  on the docket that Live Face on Web filed an amended motion for
25  summary judgment.  No.  I think you must have, because I think
```

1   you ordered that the first motion was moot.  So that was --

2   that amended motion was filed, I think, maybe less than a week

3   ago.

4            **THE COURT:**  Uh-huh.

5            **MR. ROTHMAN:**  I believe that -- I've been discussing

6   with my co-counsel there, Shawn Grady, about whether the time

7   limits that are imposed in this case are sufficient or too

8   close for us to be able, in light of this recent filing, to

9   respond or to file other motions that we intend to file.  But I

10  guess I'll throw it back to him because I think we had

11  discussed that before the call, and maybe he's going to raise

12  that issue.

13           **THE COURT:**  All right.  Mr. Grady, I see you're

14  standing up.  This isn't in front of me right now, but let's

15  hear about it.  Are y'all thinking y'all are going to be

16  seeking an extension either of time to respond to this motion

17  or other extensions of time?

18           **MR. GRADY:**  Yeah.  I would -- I request an extension

19  to -- for the motion deadline for all the dispositive motions,

20  including the response.  They're all due on the same day, April

21  14 or 15.  I would like two more weeks just because it's a

22  lot -- it's a lot of work and, you know, it would result in a

23  better work product and I could really use it.

24           **THE COURT:**  Let me ask the plaintiff.  Any objection

25  to a two-week extension for a motions deadline and response to

 1  this motion?

 2          **MR. COLQUITT:**  No, Your Honor.

 3          **THE COURT:**  All right.  Go ahead.

 4          **MR. COLQUITT:**  And just while we're talking about

 5  schedule --

 6          **THE COURT:**  Sure.

 7          **MR. COLQUITT:**  -- one thing that might be helpful

 8  scheduling wise is our mediation is set -- deadline, I think

 9  it's in June of this year.  This week we received a letter from

10  the insurance carrier for Mr. Moreno --

11          **THE COURT:**  Oh, uh-huh.

12          **MR. COLQUITT:**  -- indicating that -- a willingness to

13  negotiate.

14          **THE COURT:**  All right.

15          **MR. COLQUITT:**  We think it might be helpful to push

16  up the mediation deadline to get those negotiations going and

17  maybe resolve this case in a more efficient matter rather than

18  waiting all the way till June.

19          **THE COURT:**  All right.  Well, while we're all here,

20  we might as well have this conversation.  Let me ask you,

21  Mr. Grady, would you want to, with the insured involved,

22  mediate this case or otherwise try to reach a settlement before

23  you have to file more papers?  Because you file more papers,

24  it's going to cost your client some money.  So I'll do it

25  either -- I mean, I'll hear from you, but we -- y'all --

1          **MR. GRADY:**  I'm okay with --

2          **THE COURT:**  I'm willing to allow y'all a little bit

3    more time to do the mediation first, litigation second, but I

4    have to hear from y'all.

5          **MR. GRADY:**  Well, I've already started all the -- I'm

6    ready to do the motions before the mediation, but I'm okay with

7    moving up the deadline to set the mediation.  I'm okay with

8    that.

9          **THE COURT:**  Okay.

10         **MR. GRADY:**  And also, a trial date if we can get

11   that, that would be good as well.

12         **THE COURT:**  Let's do this.  I would be very happy to

13   set y'all a trial date, but I probably need to do that by a

14   separate status conference once I've looked at my other trial

15   dates.  I just set two -- one or two yesterday.

16         So let me say then -- let's just do these deadlines

17   that we're talking about here.  Do you need me -- let me go

18   back to the plaintiff.  Do you need me to move up the mediation

19   deadline, or can y'all just agree to mediate it?  I mean, I'm

20   happy to move it up but --

21         **MR. COLQUITT:**  Well, I think I'm -- Your Honor, in my

22   experience, brief experience practicing law, it seems to be a

23   practice that's very deadline driven.  And having the deadline

24   moved forward helps ensure that that mediation rather -- would

25   actually occur rather than it being pushed back due to

 1   deadlines in other cases and other matters that we're all

 2   taking care of.

 3            So I think we could probably agree to mediate before

 4   the deadline, but I also believe that moving the deadline up

 5   sooner will help facilitate that happening sooner.

 6            **THE COURT:**  All right.  Well, what if I set the

 7   response to your amended motion deadline and the motions

 8   deadline in general for two weeks later?  That would be April

 9   28th.

10            **MR. COLQUITT:**  Okay.

11            **MR. GRADY:**  Yes.

12            **THE COURT:**  Okay.  And then the mediation deadline

13   for two weeks after that, May 12th.  Plaintiff amenable?

14            **MR. COLQUITT:**  Yeah.  That's amenable to us.

15            **THE COURT:**  Defense amenable?  Little more time or --

16            **MR. GRADY:**  Yeah.  That's a short window.  I

17   haven't -- I don't know Mr. Moreno's schedule --

18            **THE COURT:**  Okay.

19            **MR. GRADY:**  -- the insurance carrier's schedule and

20   all that stuff.  So I got to coordinate several schedules.  I

21   think I need more time.  How about like end of May or --

22            **THE COURT:**  All right.  Well, what's the deadline

23   now?

24            **MR. COLQUITT:**  I don't have it right in front of me.

25   I think it's --

1           **THE COURT:**  June --

2           **MR. GRADY:**  I think it's June 17th.

3           **THE COURT:**  All right.  I'll split the difference.

4   We'll make it May 26th.

5           **MR. COLQUITT:**  Thank you, Your Honor.

6           **THE COURT:**  That gives you a month from the motions

7   being filed to get your mediation taken care of, approximately.

8           **MR. COLQUITT:**  Yes, Your Honor.  Thank you.

9           **THE COURT:**  All right.  Anything further from the

10  plaintiff?

11          **MR. COLQUITT:**  No, Your Honor.

12          **THE COURT:**  All right.  Anything further from the

13  defense at this time?

14          **MR. GRADY:**  No, Your Honor.

15          **THE COURT:**  All right.  That concludes the

16  proceedings in this case.  We'll be in recess.

17          **COURT SECURITY OFFICER:**  All rise.

18  * * *

19      (End of proceedings at 10:57 a.m.)

20

21

22

23

24

25

-oOo-

1

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5          I further certify that the transcript fees and format

6    comply with those prescribed by the Court and the Judicial

7    Conference of the United States.

8

9    Date:  4/24/2017
                              /s/ Chris Poage
10                            United States Court Reporter
                              655 East Cesar E. Chavez Blvd., Rm. 314
11                            San Antonio, TX  78206
                              Telephone:  (210) 244-5036

12

13

14

15

16

17

18

19

20

21

22

23

24

25